## RUMPH v. ABERCROMBIE.

1. A court of chancery has jurisdiction to set aside a deed, conveying either land or slaves fraudulently obtained. *. ّ ڙ ,
2. A contract for the sale of slaves at an inadequate price, obtained by an abuse of confidence, reposed in the vendor by the vendee, will be set aside in equity, especially in a case, where the vendor was in a weak condition of body, and in a gloomy, unsettled state of mind, so as to be peculiarly liable to imposition.

Error to the Chancery Court of Macon.

BILL filed by defendant in error, alledges, that complainant's intestate, was the owner thereof, and in possession of five slaves, a negro woman and her four children. That his intestate, before, and up to the time of her death, lived on the premises of defendant, who was a shrewd, subtle, crafty man—and the deceased, old, weak minded, imbecile, and infirm, and long before, and up to the time of her death, whol-

ly incapable of protecting her interest, or of attending to her business. That shortly before her death, the defendant, under the guise of friendship, and by fraud, and false representations, obtained the possession of the slaves, and now holds them under a pretended bill of sale, by which the deceased appears to have acknowledged the receipt of one thousand dollars ; but complainant charges that he never paid any thing, and that one thousand dollars is not more than half their value. That the defendant had the most perfect control over the deceased, and that she regarded him as her friend, and protector, and that he obtained the slaves by a fraudulent abuse of his influence over her.

The bill also charges, upon information and belief, that the conveyance was merely intended as a mortgage, to secure the repayment of money advanced by the defendant, for the deceased. That the negroes are family slaves, to which complainants are much attached, having been raised with them, &c.

The prayer of the bill, is for the cancellation of the bill of sale, the delivery of the slaves, and for general relief, &c.

The defendant answered the bill, and admitted that the deceased resided on his premises, for about a month previous to, and at her decease. That she was affected with dropsy of the chest, and from that cause infirm of body for some time previous to her death, but denies that she was very old, weak minded, &c., but on the contrary asserts, that she was possessed of a sound mind, sane memory, and vigorous intellect, up to the time of her death, and fully able to dispose of her property in a prudent, judicious manner. That the deceased, previous to her removal to defendant's premises, proposed to sell him the slaves, but declined at that time to fix the value, or put a price on them, stating that she preferred a postponement until after her removal to the premises of defendant ; and in the mean time would reflect upon it, and make up her mind as to their value.

Shortly after her removal, in October, 1844, she again proposed to sell the slaves to him, and offered them for $1,000, in ten equal annual payments—defendant objected to pur-

9

chase on these terms, and offered her $800 in cash, which he considered at the time as their full value; but she declined that proposition, and desired the payment by instalments, for the benefit of her young children. That under these circumstances, and after much persuasion, he became the purchaser of the slaves, upon the terms proposed by her, in good faith on his part.

After the contract was made, it was agreed between him, and her, that he should furnish her with such household furniture, family supplies, and other necessaries as she wanted, to the amount of one, or more of the notes executed by him. That he did furnish such articles as she wanted, to the amount of $180 37, and that his medical services are worth $120. That she died on his premises, leaving her property unprotected; that therefore he took possession of the notes executed by him for the slaves, three of which he retains to pay his claim against her, and the residue he brings into court. He makes an exhibit of the conveyance of the slaves to him, dated the 15th October, 1844. He denies all fraud, &c., &c.

The testimony, so far as it is important, will be found in the opinion of the court.

The chancellor considered, that the facts established, that the defendant had purchased the slaves from the complainant, by taking advantage of the influence he had obtained over her, and had availed himself of her weakness, to obtain an unconscionable bargain from her; set the contract aside, directed him to deliver up the slaves, and ordered an account to be taken.

From this decree the defendant prosecutes this writ, and his assignments of error open the entire case.

Gunn, for plaintiff in error, insisted that the allegations of the bill were not sustained by the proof. That the weight of evidence was decidedly in favor of the defendant, both as to the capacity of the vendor to make the contract, and the fairness of the contract which was made, as shown by the price given. That if the price was not fully adequate, it was not so grossly inadequate as to be evidence of fraud. He cited Hardeman v. Sims, 3 Ala. 747: Bibb v. McKinley, 9

Porter, 636; Bibb v. Smith, 1 Dana, 582; Jer. Eq. 395; 2 Vesey, 155; Todd v. Hardie, 5 Ala. 698; Morris v. Bartley, 2 J. J. M. 374; Thompson v. Jackson, 3 Rand. 504; Gist v. Frazier, 2 Litt. 18; Bozman v. Draughan, 3 Stew. 243; English v. Lane, 1 P. 328; Juzan v. Toulmin, 9 Ala. 663.

McLester, contra.

ORMOND, J.—The objection to the jurisdiction of chancery, upon the ground that there is no sufficient allegation in the bill, to authorize a recovery of these negroes, as "family slaves," need not be considered, as it is perfectly clear, the court of chancery has jurisdiction to set aside a deed fraudulently made, or obtained, of either land, or personal property —and it is no answer to this, that a court of law has concurrent jurisdiction in cases of fraud.  [1 Story's Eq. 68, § 60, and cases there cited.]

We are then to consider, whether the conveyance of the slaves in this case, was obtained by the defendant, under such circumstances as require a court of equity to cancel the contract.

An old woman, in the last stage of a mortal disease, and greatly depressed in spirits, without, as it appears, a home, and in want of the ordinary comforts of life, but possessed of five slaves, is carried by the defendant, who is a physician, to his house, for the purpose, as alledged of taking care of her and her children.   On the third day after her arrival at his house, she conveys to him the slaves, at the price of $1000, on a credit of ten years, secured by ten notes of one hundred dollars each, with a cotemporaneous agreement, that the defendant should furnish her such articles of household furniture and provisions as she might need, to be taken out of the notes executed by him.   These facts are certainly calculated to arouse suspicion of the fairness of the transaction. This suspicion, an examination of the testimony shows to be well founded, and makes out a case which calls for the interference of a court of equity.

It is distinctly alledged in the bill, that she was incapable, from bodily and mental infirmity, of protecting her interests,

or attending to her business for a considerable period, ante-rior to the making of this contract, and down to the time when it was made. That she was in this condition previous to her removal to the defendant's house, is conclusively es-tablished by the witnesses Merrill, Crabtree, Spence, M. Crab-tree, Sizemore, and Dr. Cloud. These witnesses, who knew her will, and most of them long before her death, all concur in stating, that she was unable to attend to her business, or make contracts. The last witness, Dr. Cloud, was her phy-sician during the year she died, to the latter part of August. He says she had a complication of diseases—had fits of deli-rium. That her mind was in an unsettled, gloomy condition. That she was entirely incompetent to the discreet manage-ment of her business, and might be easily imposed on. He thinks she had not sufficient capacity to make a contract.

On the other hand, the defendant by his answer denies the allegations of the bill, and insists that she was fully compe-tent to attend to her business, and he has introduced several witnesses, who saw her at his house, and who swear that they think she was able to contract understandingly, in refer-ence to her property. We do not think this testimony enti-tled to the same weight as the preceding, as these witnesses had but a casual knowledge of, or acquaintance with her, and might therefore be deceived. We think, however, that the result of the testimony is, that she was not *non compos men-tis*, at least at all times, but that she was in a low, weak con-dition of body, and from the gloomy condition of her mind, as described by the witnesses, peculiarly liable to imposition, by one in whom she reposed confidence ; and such we think is the result of the proof.

The defendant removed the deceased to his house, upon a promise on his part, to take care of her and her children, and the third day after her arrival, he purchases the slaves. The reason assigned for the unusual credit of ten years, *without* interest, is, that the deceased desired to keep the proceeds of the sale from being wasted after her death, and as a fund for her children ; yet it appears that at the time she was without a home, and destitute of the comforts, as well as the necessaries of life ; and as this was the only property she possessed, it must have been looked to as the only means of

her support. Accordingly we find, that at the time of the sale, the defendant contracted to furnish her with what she wanted, and as the notes were extinguished by this process, they were to be delivered up to him. Although she lived but about three weeks after the sale, the account of the defendant against her, during this short period, amounted to three hundred dollars; and it is not a little extraordinary, that one item of the account, is a charge for negro hire.

The answer of the defendant, and the proof made by him, of what took place at the sale, is quite sufficient to stamp upon the transaction its true character. The whole scene, as detailed by the witnesses, and by the defendant himself, forcibly conveys the idea of mental imbecility and blind confiding credulity on the hand, and the exercise of a controlling influence on the other.

The unwillingness of the defendant to purchase the slaves, clogged with the condition of taking care of the deceased, and her family—his offer of $800 in cash, rather than to pay $1000 in ten annual payments without interest—the urgent solicitation of the sick woman, who pleaded her destitute condition, and the neglect of her family, and when this failed to move the defendant, his final consent to make the purchase, on being reminded by the sick woman, of his promise to do so, together with the array of witnesses who are present to witness this scene, and who afterwards depose to it, so far from establishing the fairness of the transaction, do most unequivocally prove the imbecility of the deceased, and the influence which the defendant had over her. Two of the witnesses afterwards attest a formal bill of sale, which is drawn up, and the unusual precaution taken of proving, and recording it in the county court.

We cannot doubt, that this contract was obtained by the defendant, by taking advantage of the weakness, and necessitous condition of the deceased, and of the confidence she reposed in him. It is a settled rule of equity, that if confidence is reposed, and that confidence is abused, equity will grant relief. [Gartside v. Isherwood, 1 Bro. C. 150; Osmond v. Fitzroy, 3 Peere W. 329, and cases cited by Mr. Belt in his note; Watt v. Grove, 2 S. & L. 507; Wendell v.

Van Renselaer, 1 Johns. C. 350; Hugennin v. Basley, 14 Vesey, 290.]

When, by an abuse of the confidence of another, property is obtained at an inadequate price, equity will pronounce it fraudulent, and set it aside. Such appears to be the fact in this case. The slaves are proved to have been very likely, and consisted of a woman, from thirty-five to forty years old, and her four children, a girl twelve or thirteen years old, a boy nine or ten, a boy seven, and a child four years old. These are estimated by several of the complainant's witnesses. at $1350 in cash, at the time of the sale to the defendant. The defendant has introduced several witnesses, who swear that the slaves were not worth more than the defendant agreed to pay for them, upon the credit given; and what is not a little extraordinary, some of them state, that the expense and trouble of taking care of them is only a fair equivalent for the value of their labor. These estimates of value, are made in gross, without setting a value on each of the slaves, as was done by the witnesses on the other side, and is for this, and other reasons, not deserving of the same consideration. There is, however, a fact in proof, which establishes conclusively, the gross inadequacy of the price. Two of the complainant's witnesses prove, that a short time before the sale to the defendant, they had offered her $2000 for the slaves, on the same terms they were sold to the defendant. Surely, it would not require very stringent proof to establish, that five slaves of the description of these, were worth more than $1000, on ten years credit, and the fact last stated is conclusive. It is equally clear, that the principal, if not the sole inducement of the sale to the defendant, was the expectation held out to the deceased, that she and her family would be taken care of by him. How this promise was kept, is shown by the account raised against her, during the short time she lived after the sale was made. We think it impossible to doubt, upon the whole case, not only that $1000 was a grossly inadequate price for the slaves, sold without interest on ten years' credit, but that the purchase was obtained by the defendant, from the confidence reposed by the deceased in him, and the influence he had obtained over her, in her weak and necessitous condition, by his promises of

support and protection. The chancellor did not err in cancelling the contract, and directing the slaves to be delivered up to the complainant.

Decree affirmed.