## THOMPSON vs. LEE.

[BILL IN EQUITY FOR RESCISSION OF CONTRACT.]

1. *Objections to evidence.*—The appellate court will not, in a chancery case, consider an objection to evidence which was not raised before the chancellor.

2. *Rescission of contract on account of misrepresentations.*—A court of equity will rescind a contract, at the instance of the purchaser, on account of the vendor's misrepresentations as to the quantity of land subject to overflow; and it is immaterial whether the vendor knew the representations to be untrue.

3. *Release of equity of redemption set aside as fraudulent.*—Where a mortgagee avails himself of the advantages afforded by his possession of the property, his position as creditor, and the embarrassed condition and physical debility of the mortgagor, to obtain a release of the equity of redemption, a court of equity will set aside the transaction at the instance of the mortgagor.

4. *Ratification of contract after discovery of fraud.*—A court of equity will not rescind a contract, on account of the vendor's fraud, when it is shown that the purchaser, after becoming fully apprised of the fraud, ratified and confirmed the contract; but this principle does not apply, where the purchaser, being a weak and feeble old man, and having the most unlimited confidence in the vendor, is induced by professions of friendship and promises of indulgence, on the part of the latter, to execute a mortgage to secure the payment of the purchase-money, and afterwards to release the equity of redemption.

5. *Parties to bill of revivor.*—Where the purchaser files a bill for the rescission of a contract respecting real estate, and the cancellation of a mortgage on

Thompson v. Lee.

slaves afterwards given to secure the payment of the purchase-money, and dies before the rendition of a final decree in his favor, his administrator is the only necessary and proper party to the bill of revivor, when it appears that a conveyance had never been executed by the vendor.

6. *Rents and improvements.*—Where a purchaser succeeds in obtaining the rescission of a contract on the ground of fraud, he is chargeable with the rent of the land during the time he held possession of it, and is entitled to a credit for valuable and permanent improvements erected thereon by him.

APPEAL from the Chancery Court of Perry.

Heard before the Hon. JAMES B. CLARK.

THE original bill in this case was filed by Thomas M. Thompson, against Columbus W. Lee, and sought, 1st, the rescission of a contract for the purchase of a tract of land, on account of the defendant's misrepresentations as to the quality of the land, and the quantity subject to overflow; 2d, the cancellation of a mortgage on several slaves, which was afterwards given to secure the payment of the purchase-money for the land; 3d, the cancellation of a second mortgage, subsequently given for the same purpose; and, 4th, the annulling and vacating of a subsequent transaction between the parties, by which the complainant released to the defendant his equity of redemption in the mortgaged property, surrendered the land, and gave up the bond for titles. The bill was filed in April, 1847. The contract for the sale of the land was made in the fall of the year 1841. The bill alleged, that the complainant was induced to purchase the land by the representations of the defendant, who professed great friendship for him, and in whom he had the most unlimited confidence, as to its quality, situation, advantages, &c.; that the tract contained about 450 acres, and the price was $15 per acre; that the defendant also represented the lands not to be subject to overflow from a stream which ran through them, with the exception of one or two acres, and promised to grant indulgence in the payment of the purchase-money, in consideration of complainant's embarrassed condition; that defendant executed his bond for titles in pursuance of the contract, conditioned that titles should be made on the payment of the purchase-money, and complainant entered into possession of the land; that the lands proved

to be very unproductive, and totally unsuited for the purposes for which the defendant had represented them to be valuable; that one half of the entire tract was overflown every year at a time which ruined the crops growing on it; and that complainant failed to make a crop during the entire continuance of his possession.

The bill further alleged, that complainant was a man of feeble intellect, and unlearned, being unable to read writing, (though he could sign his name,) entirely ignorant of legal forms and technicalities, and having great confidence in the defendant's legal attainments; that when he discovered the lands to be subject to overflow, he proposed to rescind the contract, but the defendant declined to do so; that the defendant applied to him, in 1843 or 1844, for a mortgage on his slaves to secure the payment of the purchase-money, and complainant then urged him to take back the land, on such terms as might be just and reasonable; that the defendant refused to take back the land, urged the complainant to give him a mortgage to secure the purchase-money, and promised unlimited indulgence in the payment of the money, if secured in that way, so long as the proceeds of the cotton crops grown on the lands, after paying the expenses of the complainant's family, were applied in extinguishment of the debt; that the complainant, induced by the defendant's promises and persuasions, executed to him on the 7th February, 1844, a mortgage on fifteen slaves; that on the 15th May, 1844, he was induced by defendant to execute another mortgage, on the residue of his property, for the further security of said debt, and, in March, 1845, to release his equity of redemption in the mortgaged property, re-surrender the land to the defendant, and deliver up to him his title-bond; that these last deeds were not freely and voluntarily executed by him, but were obtained from him by the defendant, by taking an undue advantage of their relative situations, of the complainant's embarrassed pecuniary condition, and of his ill-health; that the defendant, at the time of the last transaction, had already taken possession of the mortgaged property, and afterwards dispossessed complainant of the land; and

Thompson v. Lee.

that some time after defendant had thus deprived complainant of all his property, he voluntarily conveyed four of the slaves to the complainant's wife.

The defendant answered the bill; admitting the sale of the land, and denying all the charges of fraud, misrepresentation, and undue advantage on his part. He alleged, that his representations as to the quality of the lands, the quantity subject to overflow, &c., were the mere expression of an opinion, which he still believed to be true; that the plaintiff, who had long been engaged in farming and planting, examined the lands in person before purchasing them, and bought on the faith of his own judgment; that the plaintiff's failure to make a good crop was attributable to his own mismanagement. He further alleged that, at the time the first mortgage was executed, none of the purchase-money had been paid, though two installments were due, and there had been a considerable decline in the price of property; that these facts induced him to ask for the mortgage; that each of the mortgages was executed by the plaintiff freely and voluntarily; and that the subsequent transactions between them, ending in the release of the equity of redemption of the mortgaged property, the surrender of the title-bond, and the deed of gift to Mrs. Thompson, were entered into at the suggestion of the plaintiff, and on his request that defendant, to assist in relieving him from his embarrassments, would take all his property, and, after discharging the incumbrances on it, dispose of it in such manner as he might think most advantageous for the interests of himself and his family; and that defendant, in pursuance of this arrangement, after paying two notes due to one Alexander, and the amount due to himself on account of the purchase-money for the land, conveyed five of the slaves, which constituted the entire residue, to Mrs. Thompson.

On final hearing, on pleadings and proof, the chancellor refused to grant a rescission of the original contract, but set aside the release of the equity of redemption, ordered the title-bond to be delivered up to Thompson, the notes for the purchase-money to be held as subsisting

securities in Lee's hands, and the relation of mortgagor and mortgagee to be re-established between the parties.

From this decree, the complainant appealed; assigning as error the refusal of the chancellor to grant a rescission of the contract. By consent, cross assignments of error were filed on the part of the defendant, impeaching the correctness of the chancellor's decree in the relief granted to the complainant.

During the pendency of the cause in this court, the complainant's death was suggested; and leave was thereupon granted by the court, on motion, to revive the suit in the names of his heirs-at-law or administrator, or both, as might be deemed proper by the court. The cause was submitted, after elaborate argument, at the June term, 1854, and was held under advisement until the present term; several re-arguments, both oral and written, being ordered and had in the meantime. The great length of the printed arguments, embodying a detailed statement and analysis of the evidence, as well as a full discussion of all the legal questions presented by the record, precludes the possibility of their insertion in the report. The subjoined abstract of the points made, with the authorities cited in support of them, is condensed from the printed arguments of Mess. I. W. GARROTT, for the appellant, and WM. M. BROOKS, with whom were WM. M. BYRD, WM. M. MURPHY, and GEO. P. BLEVINS, for the appellee.

*Points made, and authorities cited, for the appellant:*

1. The defendant's misrepresentations as to the quality of the land, and especially as to its liability to overflow, whether made knowingly or ignorantly, entitle the complainant to a rescission of the contract.—Read v. Walker, 18 Ala. 324; Monroe v. Pritchett, 16 Ala. 785; Tucker v. Woods, 12 Johns. 190; Smith v. Richards, 13 Peters, 26, 38; 1 Story's Equity, § 193.

2. The fact that the purchaser, being a man of weak understanding, dealt with one in whom he reposed great confidence, and who abused that confidence, under circumstances which show undue influence and imposition, is sufficient to justify the interposition of the court in his

behalf.—1 Story's Equity, §§ 238, 303; Gartside v. Isherwood, 1 Bro. Ch. 558; Rumph v. Abecrombie, 12 Ala. 64; Morrison v. McLeod, 2 Dev. & Bat. Eq. 22; Buffalow v. Buffalow, 2 Dev. & Bat. 241; 8 Cowen, 361; Boney v. Hollingsworth, 23 Ala. 690; 6 Vesey, 266, 278; 9 Vesey, 292; 3 Vesey & B. 117; 9 Price, 169.

3. Thompson's retention of possession, after discovering that the lands were subject to overflow, cannot be held a waiver of the fraud, or a confirmation of the contract. His continuance in the possession is shown to have been the result of Lee's persuasions and influence. It appears, moreover, that he was assured by Lee, pending the negotiation, that if he did not like the land, after trying it, he might give it up, and pay rent. In addition to these facts, the contract was incapable of confirmation, so long as the relative positions remained unchanged.—8 Cowen, 361, 375; 15 John. 571; 7 Mar. 353; 2 Beavan, 76.

4. The mortgage, subsequently given to secure the purchase-money, cannot be considered as a ratification of the contract, such as will take away the right to rescind on account of the fraud. The circumstances under which the mortgage was given, the relations of the parties, the confidence confided in the mortgagee, the undue influence exerted by him over the mortgagor, and the embarrassed condition of the latter, render the mortgage itself fraudulent.—1 Sugden on Vendors, 326, § 26; Baugh v. Price, 1 Wils. 329; 1 Story's Equity, § 345; Whelan v. Whelan, 3 Cowen, 537; 1 Russ. & My. 425. Besides, it is not put in issue by the pleadings, and is not shown by the testimony, that Thompson was apprised, when he gave the mortgage, that it would confirm the previously invalid sale; and this fact is essential to constitute a confirmation.—1 Sugden on Vendors, 327, § 41; 1 Russ. & My. 425; 5 Dana, 232; 3 Dana, 289; 4 Dana, 269; 9 Dana, 452; 1 Ball & Beatty, 303; 2 Ball & Beatty, 304, 317; 2 Sch. & Lef. 474; 1 Bro. Ch. 338; 12 Vesey, 355, 373; 18 Vesey, 120; 2 Cox's Ch. Cas. 253–75; Chitty's Equity Digest, 507, §§ 7–13.

5. The position of the parties as mortgagor and mortgagee is entitled to great weight in determining the

validity of the subsequent transactions between them, and throws upon the defendant the *onus* of showing (what he signally fails to show) that he derived no advantage from those transactions, but paid full value, and that the mortgagor acted freely and voluntarily, and with full knowledge of all the facts.—2 Sch. & Lef. 214; 2 Cruise's Dig., 144, § 86; 2 Sugden on Vendors, 367, § 6.

6. The chancellor should have gone further, and, although declaring the mortgage valid, should have decreed that Lee return the slaves and other property, taken from Thompson, and account for their use and hire. The mortgage itself guarantied the possession of the property to Thompson; and if Lee, by force, fraud, or the exercise of undue advantage, obtained the possession in violation of the terms of the contract, he should be required to restore it, and to account for its use and profits, before he is placed in a position to proceed for a foreclosure of the mortgage.

7. It was not necessary that the plaintiff should formally offer to pay the defendant the amount due on the notes for the purchase-money, when his whole bill proceeds on the idea that the defendant has been already overpaid. Elliott v. Boaz, 9 Ala. 772–79; Nelson v. Dunn, 15 Ala. 515; 1 Dan. Ch. Pr. 442.

4. The relief granted by the chancellor was within the scope and purview of the case made by the bill, and not inconsistent with the relief therein prayed.—Mitford's Eq. Pl. 38, 39: Story's Eq. Pl. § 41; Strange v. Watson, 11 Ala. 325.

*Points made, and authorities cited, for the appellee :*

1. That Thompson was a man of ordinary intellect, and, consequently, fully capable in law of making a contract, is proved by the testimony of seventeen disinterested witnesses, while not one witness testifies to the contrary. That he made a good trade in purchasing the land, that the land was intrinsically worth the full amount he paid for it, and that Lee's representations as to its quality and productiveness were true, is established by the concurrent testimony of sixteen credible witnesses;

while the complainant's witnesses to the contrary are but eleven, of whom four are his sons and son-in-law. That the complainant's failure to make good crops on the land was attributable solely to his own indolence and mismanagement, is abundantly proved. And upon the question of undue influence, the complainant's own testimony is inexplicable, and contradicted in the most positive manner by several disinterested witnesses. There is, then, no ground for a rescission of the contract established by the evidence.

2. If the contract was originally invalid as alleged, the defendant has waived the right to insist on a rescission, by his laches, acquiescence, and positive ratification of it by repeated acts.—Griggs v. Woodruff, 14 Ala. 16; Saddler v. Robinson, 2 Stew. 520; Duncan v. Jeter, 5 Ala. 604; Clements v. Loggins, 1 Ala. 622; Fitzpatrick v. Featherstone, 3 Ala. 42; Rice v. Davis, 4 Ala. 83; Smith v. Robinson, 11 Ala. 840; Parks v. Brooks, 16 Ala. 529; Gilmer v. Ware, 19 Ala. 258; Lawrence v. Dale, 1 John. Ch. 42; Dill v. Camp, 22 Ala. 249.

3. The relief granted by the chancellor was inconsistent with the case made out by the bill. The bill alleged, that the sale and the notes given for the purchase-money were fraudulent and void, and asked that they might be set aside; that the mortgages were fraudulently obtained, and asked that they might be canceled. The decree sets up the notes and mortgages, and declares them valid and subsisting securities. That there is a fatal inconsistency between the allegations of the bill and the relief granted, is shown by the following authorities: Cooper's Equity Pl. 14; 2 Madd. Ch. 139, 537; 16 Peters, 182; 8 Leigh, 519; 2 Dev. Eq. 44, 403; 1 Bland, 236; 6 Har. & John. 29; 7 Wheaton, 522; 6 John. 564; 12 Leigh, 69; 13 Ala. 693; 22 Ala. 106; 2 Paige, 396; 1 Barb. Ch. 329; Litt. Sel. Cas. 146. Nor can the decree be sustained under the general prayer.—1 Story's Eq. Pl. § 340; 1 Dan. Ch. Pr. 421–24; 1 Dev. Eq. 437; 2 Paige, 397; 1 Sm. & Mar. 17; 1 Edw. Ch. 634; 4 Dess. 330; 9 Yerger, 301; 18 John. 560; 5 Beavan, 103.

STONE, J.—The mass of the evidence in this case is so great, that any attempt at an analysis of it would swell this opinion beyond reasonable dimensions. We shall, therefore, content ourselves with a statement of the conclusions we draw from it. We are convinced, then, by the testimony—

1. That Mr. Thompson's intellect should be classed as ordinary; and that he was credulous, with but little strength of will;

2d. That he trusted in Lee with child-like confidence;

3. That he was induced to purchase the land, partly by the representations of Lee as to its quality, and partly by Lee's protestations of friendship and gratitude;

4. That the quantity of the land subject to overflow was misrepresented and understated by Lee;

5. That the land was not worth the price for which it was sold;

6. That when Lee applied for the first mortgage, Thompson proposed a rescission of the contract, which Lee did not accede to;

7. That Thompson was induced to execute the first mortgage by Lee's reiterated expressions of friendship, and assurances of liberal indulgence;

8. That in procuring a re-surrender of the lands, and a sale of the slaves and other property, Lee availed himself of the advantages he apparently had as mortgagee and creditor, and of the embarrassed condition of his debtor; and that Thompson entered into that contract, rather by force of the circumstances around him, than the free exercise of his judgment.

[1.] The first and second of these consecutive propositions are sustained by the uncontroverted facts in this case, independent of the opinions of the witnesses. It is here argued, that *influence* and *confidence* can not legally be proved by the opinions of witnesses. We need not announce what would be our opinion on this point, if it were presented for our decision. It is not so presented. The record does not inform us that this question was brought to the notice of the chancellor; and, in the absence of such information, we will not consider any

objection which seeks to exclude the evidence.—McKee v. Nelson, 4 Cowen, 355.

Holding Lee to the admissions in his answer, as to the quantity of land which he represented as subject to overflow, the third and fourth propositions are established by all the testimony bearing on those points.

The result of all the evidence, though there is in it great and irreconcilable conflict, fixes the value of the land much below fifteen dollars per acre.

The testimony certainly establishes the proposition, that Thompson desired and proposed a rescission of the contract. True, he did not claim it *as a matter of right*, growing out of the fraudulent misrepresentations of Lee as to the overflow. He alluded, however, to the fact that the land did overflow to a greater extent than had been represented, and claimed the right to rescind, in pursuance of what he said had been their first agreement; namely, that if Thompson, after testing the land, did not like it, he might rescind the contract, and pay rent for the land. Lee refused to rescind, and stated he did not remember any such stipulation in the contract.

It is here argued, that there is no averment in the bill of an offer to rescind. One charge in the bill is in the following language: "Your orator further charges, that after he had tested the quality of said lands, and found them subject to overflow as aforesaid, he proposed to rescind the contract of sale, which defendant declined." This is certainly the averment of a direct offer to rescind. We do not think the next succeeding averment in the bill ought to be construed as a qualification of the foregoing. It rather appears to be another and distinct offer of the land back, "on such terms as might be reasonable and just." There are no words which connect the two sentences as relating to one and the same offer of rescission.

We reserve the seventh proposition for after consideration.

In regard to the eighth proposition, we adopt the language of the able chancellor who rendered the decree in this cause: "The whole transaction seems to have been a sweeping business, in which Lee seemed to settle the matter to suit

himself; and while the evidence is very conclusive that the complainant, near three months afterwards, released the title-bond, and relinquished the equity of redemption in the slaves, still it must be remembered, that Lee had taken possession, as some of the evidence shows, by virtue of his mortgage; that he was still in possession under that mortgage, or the agreement for a release; and that the whole transaction had been one most disastrous to the complainant, who had been pursuaded by Lee to purchase his lands, and had, by unfortunate circumstances, within little more than three years, been stript, not only of this land, but a likely lot of slaves, twelve, if not seventeen in number. Under such circumstances, it is impossible to say that the complainant and Lee stood on an equality, when the release was made. * * * The complainant was an old, feeble man, of moderate intellect, with spirits broken, and subdued by misfortune; while, on the other hand, Lee was a man of wealth and high intellect, in the possession of all the property to which complainant had any claim, under a mortgage that he admits he promised to indulge almost indefinitely, before foreclosing it, or under an agreement, the terms and particulars of which resulted in his being dispossessed of all the property, at a time when he was preparing to pitch a crop."

Ch. J. Chilton, in considering this question, employed the language, as the result of the evidence, "that this alleged sale was made under circumstances of great inequality—such as were well calculated to give Lee a decided advantage over Thompson, and to deprive the latter in a great measure of his free agency. The proof is conflicting, as to whether Lee did not take possession under his mortgage before the alleged purchase. But be this as it may, he reminded Thompson that it was forfeited. Thompson was at his mercy—embarrassed, dispirited, and enfeebled by disease. A general sweeping sale is made. No specific price is agreed on for each slave or article sold; but it seems the land, with all the improvements put on it by Thompson, the gin, two horses, and a mule, with all Thompson's negroes, (seventeen in num-

Thompson v. Lee.

ber,) are worth the amount of the claims due to Lee, and the demands due to Alexander."

In addition to what is above so forcibly expressed, it is not out of place to add, that at the time the terms of this settlement were agreed on, Thompson was in wretchedly bad health, if he was not bed-ridden. His attending physician testifies, that he was physically incapable of attending to business.

Another fact in the record should, in our judgment, weigh something. A period of only a little more than a year had elapsed, since Lee had promised almost unlimited indulgence, if Thompson would give him such portion of his cotton crops as should remain after paying for his coffee, &c. Thompson had complied with this agreement; and yet we find Lee, according to the testimony most favorable to him, indulging the remark, that his money had been long due.

[2.] If the first purchase, and the so called settlement above described, made up the sum of this transaction, we could not hesitate to grant to complainant all the relief he asks for. The purchase would be rescinded, on account of the misrepresentation of the quantity of land subject to overflow. On this point, it is immaterial whether Lee knew the representation to be untrue.—See the authorities collected in Trippe v. Trippe, 29 Ala. 643; Foster v. Gressett, 29 Ala. 393; Atwood v. Wright, 29 Ala. 346; Williams v. Mitchell's Adm'r, 30 Ala. 299.

[3.] Neither can the so called settlement be permitted to stand.—See 1 Story's Equity, §§ 261, 251; Hyndman v. Hyndman, 19 Verm. 9.

[4.] It is contended, however, that Thompson, with a full knowledge of the misrepresentations of Lee, and of any fraud that may have been practiced upon him, repeatedly ratified the contract, and has thus precluded himself from insisting on a rescission. It is conceded, that if one who has been defrauded, and who has become fully apprised of the fraud, afterwards ratifies such voidable contract, or enters into new stipulations in regard to the subject-matter of the contract, inconsistent with his right to insist on a rescission, and there be nothing more in the

transaction, he can not be heard to complain of such fraud.—Griggs v. Woodruff, 14 Ala. 16; Sadler v. Robinson, 2 Stew. 520; Parks v. Brooks, 16 Ala. 529; Foster v. Gressett, *supra.* This principle embraces all those cases where, either from the fraud or misrepresentation of the vendor, the purchaser is armed with a right to rescind. In all such cases, if the purchaser, after discovering the fraud, do any act inconsistent with his right to rescind, and such act be not superinduced by the fraud of the vendor, he must be held to his bargain.

But there is another class of cases, which comes under a different rule. We refer to contracts of parties between whom there exists some peculiar confidential or fiduciary relation. All contracts of this class are regarded, *prima facie,* as constructively fraudulent; and the *onus* is cast on the party seeking to set them up, of proving the *bona fides* of the transaction, and of repelling the imputation of bad faith and oppression which the law casts on him.—See 1 Story's Equity, §§ 307-8-9; Goddard v. Carlisle, 9 Price, 169; Boney v. Hollingsworth, 23 Ala. 690. To give validity to a confirmation of a contract, such as last stated, it must be shown that the party was "fully acquainted with his rights; that he knew the transaction to be impeachable which he was about to confirm; and that with this knowledge, and under no influence, he freely and spontaneously executed the deed."—Dunbar v. Tredennick, 2 Ball & Beatty, 304; Roche v. O'Brien, 1 *Ib.* 330; 1 Story's Equity, § 345, and note.

This case, it is true, is not one of technical trust and confidence. These parties did not stand in any relation, one to the other, which, *per se,* imposed on Lee the *onus* of repelling the imputation of fraud. Hence we hold, that if this case stood on the naked ground, that Thompson confided in Lee as his friend, and that in the contract Lee, by accident or superior skill, made a profitable bargain, there is no principle of law which would justify us in granting to complainant the relief he prays. Such a principle would place the man of honorable bearing under disabilities, from which the notorious sharper would be exempt. The law does not exact such scrupulous morali-

ty.—1 Story's Equity, § 308. On the other hand, it is well and clearly settled, that "if confidence is reposed, it must be faithfully acted upon, and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interests, and overreaching bargains." In Dent v. Bennett, 4 Mylne & Craig, 269, Ld. Cottenham, quoting from Sir Samuel Romilly, said, "The relief stands upon a general principle, applying to all the variety of relations in which dominion may be exercised by one person over another."—See, also, Huguenin v. Basely, 14 Vesey, 273; Rumph v. Abercrombie, 12 Ala. 64; Morrison v. McLeod, 2 Dev. & Batt. 221; Buffalow v. Buffalow, *ib.* 241; Gartside v. Isherwood, 1 Bro. C. C. 560; Gibson v. Jeyes, 6 Vesey, 278; Whelan v. Whelan, 3 Cowen, 576; Fanning v. Dunham, 5 Johns. Ch. 122; Lester v. Mahan, 25 Ala. 445; Crowe v. Ballard, 1 Vesey, jr., 215.

The act which tends most strongly to prove confirmation in this case, is the execution of the first mortgage. That act, if it stood unexplained, we would be disposed to hold a waiver of the right to rescind the contract of purchase. Was that mortgage the voluntary, uninfluenced act of a free man? The bill charges, among other things, that Lee induced Thompson to execute the mortgage, by strong and oft repeated professions of friendship, and promises of almost indefinite indulgence. The answer does not, in terms, deny these professions of friendship, or promises of indulgence. The testimony, on this point, fully sustains the averments of the bill. The letter of Lee, found in the record at page 14, to our minds, furnishes more than simple evidence of a promise to indulge, given after the execution of the mortgage. If nothing on that subject had been previously discussed between the parties, it is not probable that letter would have been written. If the letter was in answer to any previous request of Mr. Thompson, either verbal or in writing, there would most likely be found in it some expression pointing to that fact. Nothing of the kind is found in the letter. To say the least of it, it is a singular production under the circumstances. We think it fully

corroborates the witnesses, who testify to previous promises of indulgence. That Lee had almost unlimited control over Thompson, and knew that he had such control, we think is fully sustained by the record. It is also shown, as we have before stated, that notwithstanding Thompson faithfully complied with his agreement to turn over his cotton crops to Lee; yet, in little more than one year after the lavish expressions of friendship and intended indulgence by the latter, we find him at least anxious to collect his debt. Some of the witnesses say, that he took possession of the entire property without the previous knowledge or consent of Thompson. The testimony most favorable to him puts in his mouth the expression, that his debt had been a long time due. This, too, at a time when Thompson was not in a physical condition to attend to business. In this connection, we feel it our duty to refer to the expression of Lee to the witness Fields, "that the set or family of Thompsons were not capable of holding property without a guardian." Although this remark was used in jest, it contrasts significantly with the strong expressions of friendship and gratitude previously indulged.

The execution of the second mortgage, and the payment of the cotton, may be explained on the same principle. The influence of Lee over Thompson, and the plighted friendship of the former, continued unbroken through those two transactions. Indeed, the payment of the cotton was in strict compliance with the alleged verbal agreement.

We feel it our duty, then, to declare, as the result of the evidence found in the record, that the defendant has failed to show a ratification by the complainant of the original contract in this case. Thompson had unbounded confidence in Lee; Lee fostered and encouraged that confidence—held out to the feeble old man the strongest hopes; and the proof shows that he did not keep the influence he exerted over Thompson "free from the taint of selfish interest." We think the entire transaction, disastrous in its results as it was rapid in its consumma-

tion, receives its complexion from the last act, which left the complainant destitute.

The deed of gift from Lee, in trust for Mrs. Thompson, secures a vested remainder in the children of the latter. Those children are not made parties to this suit, and hence no relief can be granted as to the five slaves thereby conveyed. Lee, having voluntarily settled them on Mrs. Thompson, with the knowledge and approbation of Mr. Thompson, should not be held accountable for them.

[5.] The conclusions we have attained, render it unnecessary and improper that the heirs of Thomas M. Thompson should be parties to the revivor. The administrator alone, John F. Thompson, is a necessary party; and this suit is, therefore, revived in his name as such administrator.

The decree of the chancellor is reversed; and this court, proceeding to render such decree as the chancery court should have rendered, doth hereby order and decree, that the contract for the purchase of said lands, the notes given for the purchase-money, and the two several mortgages executed by Thompson to Lee to secure the purchase-money, are hereby vacated, annulled and avoided. The conveyance of the slaves by Thompson to Lee, to the extent of the twelve slaves received and retained by Lee, is also set aside, vacated and annulled.

The registrar will take and state an account, charging Lee with the value of such of said twelve slaves as he disposed of before this bill was filed, with interest on that value. The complainant has the option of taking the price for which Lee sold the slaves, or the value at the time of the conversion, to be ascertained by the registrar. Williams v. Crum, 27 Ala. 468; Craft v. Bullard, 1 Smedes & Marsh. 366. If the complainant elect to take the value at the time of the conversion, and that conversion be fixed at the time of the sale; or, if he take the price for which Lee sold the property, then Lee must be charged with reasonable hire for the slaves while they were in his possession, and interest upon it.

Such of the slaves as remained in the possession of said Lee at the filing of the bill, and their increase, if they can

be obtained, it is ordered, adjudged, and decreed, that the complainant recover of the said defendant, together with reasonable hire therefor; or the value of such slaves with interest, if said slaves can not be obtained.

Lee must also be charged with whatever money and other property he has received from the complainant, and not otherwise accounted for, with interest upon it. The complainant must be charged with reasonable rent for the land while in his possession, and interest upon it. He must also be charged with the two small notes he owed to Lee on other transactions, the payment made by Lee on the Alexander debt, and any other debts of Thompson paid by Lee with the privity and consent of the former; with interest on these several sums. Thompson must be credited with the value of any permanent and valuable improvements placed on the land by him, and with a reasonable price for his labor and materials in planting a crop of oats, and preparing the ground in the spring of 1845, with interest on these items.

In taking the account, the registrar will consult the pleadings and proofs on file, and such other legal evidence as may be offered.

Let the costs of this appeal and the costs of the court below be paid by the defendant Lee.

