# Waddell, Adm'r, *v.* Lanier *et al.*

*Bill in Equity to set aside Fraudulent Conveyance.*

1. *Fraudulent Conveyance; jurisdiction of equity to relieve against.*—A court of equity has original jurisdiction to relieve against conveyances obtained by fraud, or undue influence ; and it is no objection that, in the particular case, there may be a concurrent remedy at law.

2. *Same ; right of administrator to assail.*—The administrator has such a right in the lands of his intestate, as will enable him to maintain a bill in equity for the cancellation of a conveyance of the lands obtained by fraud, the heirs being made parties.

3. *Conveyance; what presumptively fraudulent.*—Where the grantor and grantee sustain relations of trust and confidence, such a principal and agent and the like, any transaction between them will be narrowly watched and closely scrutinized by a court of equity, and relief will be granted against contracts entered into between them, unless the party claiming the benefit of the contract shows by clear and convincing proof that he acted with perfect good faith, and did not abuse or betray the confidence reposed in him ; and where the donee is of superior mental capacity, or the donor of weak or feeble intellect, the presumption of fraud will require stronger evidence to remove it.

4. *Conveyance; what fraudulent.*—In this case the court holds that the following facts justify a decree of cancellation : In 1867, the husband of intestate deeded to her his entire estate, real and personal, and died in 1870. They had no lineal descendants. Twelve days after his death, she executed to Lanier an unqualified power of attorney to transact her business, discharging at the same time a person who had acted as agent for her husband in his lifetime, and for her up to that time. The appellee, Lanier, was indebted to her husband in his lifetime and the indebtedness was transferred to her. The intestate of appellant was near ninety years of age, partially paralyzed, her mind enfeebled and her body diseased. Shortly after the execution of the power of attorney, Lanier removed her to his house, and he and his family paid great attention to her. While sustaining these relations, a deed is executed which conveys to Lanier all the property of intestate, upon a purely voluntary consideration. This deed is prepared by an attorney, at the request of Lanier, who at the same time directs the preparation of an obligation to support intestate during her life; but it is not shown whether this obligation was ever executed or not. STONE, J., dissented.

APPEAL from Lee Chancery Court.

Heard before Hon. N. S. GRAHAM.

This was a bill filed by the appellant, James F. Waddell, as the administrator of Ann Campbell, against the appellee, E. F. Lanier and Mary E. Hopkins, as the sole heir-at-law of said Ann. The bill seeks a cancellation of a certain deed of gift made by Ann Campbell in her lifetime to the appellee,

Lanier, and for an account of the property which had come to his hands by virtue of said deed. The lands conveyed in the deed were situated in Chambers county. Lanier was a resident of Georgia, and Mary E. Hopkins resided in Russell county, Alabama. The bill was originally filed in Russell Chancery Court, and was, by consent, transferred to the Chancery Court of Lee county, subject to any defense which could have been made against it in Russell county. The bill alleged that Lanier had, by fraud and undue influence, procured the execution of the deed by intestate of appellant, who was an old lady ninety years of age, and of feeble bodily and mental health. The facts relied on to sustain this allegation are fully stated in the opinion of the court. The bill was demurred to by Lanier for want of equity, for multifariousness, and because it was filed in the Chancery Court of Russell instead of Chambers county. This demurrer was overruled. Lanier also filed a sworn answer as required by the bill, in which he specifically and pointedly denied every charge of bad faith, undue influence, and fraud. On a final hearing the Chancellor dismissed the bill, and this appeal is prosecuted from that judgment.

HOOPERS & WADDELL, for appellant.

W. H. DENSON, and CLOPTON, HERBERT & CHAMBERS, contra.

BRICKELL, C. J.—A court of equity has original jurisdiction to relieve against conveyances of real or personal estate obtained by fraud or undue influence, or an abuse of confidence; and it is no objection to the exercise of the jurisdiction, in the particular case, that there may also be a concurrent remedy at law. The cancellation of the conveyance, which a court of equity alone can decree, and an adjustment in the same suit of matters of account, which necessarily exist in nearly all cases of the kind, render the remedy in equity more adequate than any which can be pursued at law. *Rumph v. Abercrombie*, 12 Ala. 64. The jurisdiction must be invoked by a proper party, for no court of law or equity can grant relief against the conveyance, except at the suit of a party having an interest affected by it, or a title to complain of it. The personal assets of an estate, by operation of law, or the grant of administration, vest in the administrator, and if the conveyance is of personal property, he has the interest affected by it and title on which to seek relief against it. The statutes may not confer on him an estate or interest in the lands of the intestate, but they clothe him with an authority to rent and to obtain orders for the sale of them, to the

exercise of which possession is necessary. The right of possession enables him to maintain ejectment or other appropriate action at law, for the recovery of possession when it is unlawfully withheld.—*Masterson v. Girard*, 10 Ala. 60; *Golding v. Golding*, 24 Ala. 122; *Russell v. Erwin*, 41 Ala. 292. The same right will enable him to maintain a bill in equity for a cancellation of a conveyance of the lands of the intestate obtained by fraud, the heirs being made parties. The demurrer to the bill was not well taken, and ought to have been overruled.

We are then to consider whether the present conveyance from the intestate to the appellee, Lanier, was executed under such circumstances as require a court of equity to pronounce a decree of cancellation. It being an undisputed fact, that the conveyance is not founded on an adequate consideration of value, but is purely voluntary; and that at, and prior to its execution, the relation of principal and agent existed between the intestate and the appellee—that under a power of attorney unlimited in its terms, subject to no limitation except such as the law would imply, she had delegated to him the custody of her estate and the management of her affairs, the principles to the test of which the validity of the conveyance must be subjected can not be matter of doubt or controversy. All transactions between trustee and *cestui que trust*, guardian and ward, attorney and client, principal and agent, parent and child, are narrowly watched and jealously scrutinized in courts of equity. In all the variety of the relations of life, in which confidence is reposed and accepted, *and dominion may be exercised by one person over another*, the court will interfere and relieve against contracts or conveyances, when they would abstain from granting relief, if no particular relation existed between the parties, in which trust and confidence was reposed and accepted, and there was not an opportunity for an abuse of the confidence and the exercise of undue influence. Though in this class of cases there are often marks and traces of direct and positive fraud, of artifice, imposition, overreaching and unconscionable advantage, the principle on which the court proceeds, in granting relief, does not depend on the existence of such facts. Relief is granted, not because there is actual fraud, but on a principle of public policy, to prevent fraud, and to remove all temptation for its commission.—1 Story's Eq. § 307. The principle is thus stated by Judge Story: "It is undoubtedly true, as has been said, that it is not upon the feelings which a delicate and honorable man must experience, nor upon any notion of discretion, to prevent a voluntary gift or other act of a man, whereby he strips himself of his

[Waddell, Adm'r, v. Lanier et al.]

property, that courts of equity have deemed themselves at liberty to interpose in cases of this sort. They do not sit, or affect to sit, in judgment upon cases, as *custodes morum*, enforcing the strict rules of morality. But they do sit to enforce what has not inaptly been called a technical morality. If confidence is reposed, it must be faithfully acted upon, and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interest, and cunning, and overreaching bargains. If the means of personal control are given, they must be always restrained to purposes of good faith and personal good. Courts of equity will not, therefore, arrest or set aside an act or contract merely because a man of more honor would not have entered into it. There must be some relation between the parties, which compels the one to make a full discovery to the other, or to abstain from all selfish projects. But, when such a relation does exist, courts of equity, acting upon this superinduced ground, in aid of general morals, will not suffer one party, standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance, for it is founded in a breach of confidence. The general principle, which governs in all cases of this sort, is, that if a confidence is reposed and that confidence is abused, courts of equity will grant relief."—1 Story's Eq. § 308.

The relation of principal and agent, is affected by the same considerations which influence the court in dealing with transactions between persons standing in other fiduciary relations, and the same learned judge and author says : "It is therefore for the common security of all mankind, that *gifts procured by agents*, and purchases made by them, from their principals, should be scrutinized with a close and vigilant suspicion. And, indeed, considering the abuses which may attend any dealings of this sort between principals and agents, a doubt has been expressed whether it would not have been wiser for the law in all cases to have prohibited them; since there must always be a conflict between duty and interest on such occasions. Be this as it may, it is very certain that agents are not permitted to become secret vendors or purchasers of property which they are authorized to buy or sell for their principals ; or, by abusing their confidence, to acquire *unreasonable gifts or advantages ; or, indeed, to deal validly with their principals in any case, except when there is the most entire good faith, and a full disclosure of all facts and circumstances, and an absence of all undue influence, advantage, or imposition.*"—1 Story's Eq. § 315. A principle applying in all this class of cases, is, that on the person claiming under the contract or gift, rests the burthen of

proving satisfactorily, that it is just, fair and equitable in every respect, and not on the party seeking to avoid it, to establish that it is fraudulent.—1 Story Eq. § 311; *Bony v. Hollingsworth*, 23 Ala. 690. In this case, it is said : " There may be no fraud ; every thing may be honest and fair ; but until the act is satisfactorily accounted for, the inference of fraud, artifice, or abuse of confidence, is so strong, that we think equity should relieve against it." The annotators of the Leading Equity Cases, thus state the rule : " Where the circumstances are such as to give rise to an inference of undue influence, the burden of proof is on him who claims under the deed or transfer, to rebut the presumption, and show that the gift was not obtained through means which the court must condemn. It should, consequently, appear— 1. That the donor understood and knew what he was doing. 2. That the act proceeded from his own mind, or if the suggestion come from without, that it was deliberately adopted by him ; and, finally, that if in carrying out his purpose, he reposed a confidence in another, or relied on him for guidance, that the latter did all which the acceptance of such a trust implies, viz : giving the advice and information which, if duly weighed, might operate to prevent the execution of the act."—2 Lead. Eq. Cases, 4 Am. Ed. 1194. In *Hunter v. Atkyns*, 3 Myl. & K. 113 (8 Cond. Eng. Ch. 314), the rule is thus stated by Lord Brougham : " I take the rule to be this : There are certain relations known to the law as attorney, guardian, trustee ; if a person, standing in these relations to client, ward, or *cestui que trust*, takes a gift, or makes a bargain, the proof lies upon him, that he has dealt with the other party, the client, ward, &c., exactly as a stranger would have done, taking no advantage of his influence or knowledge, putting the other party on his guard, bringing every thing to his knowledge which he himself knew. In short, the rule, rightly considered, is, that the person standing in such relation must, before he can take a gift, or even enter into a transaction, place himself in exactly the same position as a stranger would have been in, so that he may gain no advantage whatever from his relation to the other party, beyond what may be the natural and unavoidable consequence of kindness arising out of that relation." In the application of this principle, which controls a court of equity in determining the validity of such transactions, it is not essential that the donor should be of unsound mind, or of feeble, or impaired intellect. Unsoundness of mind, if reaching insanity, or reducing the donor to idocy, would of itself avoid the contract or gift. Feebleness of intellect, or its diminution, or infirmity, from age, disease, or other cause,

[Waddell, Adm'r, v. Lanier et al.]

would be a circumstance of importance, if the inquiry was directed to the existence of actual fraud. The experience of life shows that an artful, designing man, may obtain a controlling influence over one whose intellect is superior to his own."—*Rhodes v. Bate,* 1 Ch. Ap. 252; *Todd v. Grove,* 33 Md. 188. But there can be no doubt, if the donor has intelligence, force of character, resoluteness of will, and knowledge of the character of the transaction is traced to him, the presumption of undue influence is materially lessened. While feebleness of intellect, irresolution of character, vacillation of will, increase the presumption, and require that it should be repelled by stronger and more conclusive evidence.

With this statement of the principles, to the test of which the validity of this conveyance must be subjected, we will inquire, if it is shown by the grantee, that it is just, fair and equitable—that he dealt with the principal, exactly as a stranger would have done, putting her on her guard, gaining no advantage from the relation, beyond the natural and unavoidable consequence of kindness.

The prominent facts are that the husband of the intestate, in 1867, of which the appellee had knowledge, conveyed to her by deed all his real and personal estate, of the value of not less than eight thousand dollars. They were without descendants, and their only known relation was a niece of the intestate, residing from her a distance of about thirty miles. The husband died in 1870, and twelve days thereafter, the intestate gave the appellee the power of attorney to which we have referred. There is no evidence that the intestate had ever seen the appellee more than once before the execution of the power of attorney is suggested, and that was during the life of the husband, when he visited him, the only time he was ever at the husband's residence. The appellee was indebted to the husband, (and the indebtedness was transferred to the intestate,) in a sum exceeding thirty-one hundred dollars. The intestate was near, if not full ninety years of age, partially paralyzed, her mind enfeebled, and her body diseased. The power was executed at the suggestion of the appellee, and after his representation that her business, which seems to have been entrusted to Hill, was not in safe hands. It is drawn with care and skill, but by whom, or where, or who gave the instructions for its drawing, is not shown. After its execution, the appellee and his family were assiduous in their attentions to the intestate; and at their residence, some seven or eight miles from her place of residence for near thirty-five years, away from her old acquaintances, with comparative strangers, she is induced to spend the greater part of her time. A single visit is made

to her niece, and then she is accompanied by the appellee. The rents and profits of her lands, the appellee takes under his control as her agent, collecting debts due her, and making sales of cotton remaining on the premises at the death of the husband, but so far as is shown by the evidence, no account was ever rendered to the intestate, nor did she make any inquiry as to his management, or as to the disposition of any moneys made by the appellee. There was unlimited confidence reposed and accepted. The agency continuing, the conveyance is prepared by an attorney, having no acquaintance with the intestate, who had never spoken to her, and never saw her but once, and then at a distance. The request, and instructions for its preparation, are communicated to the attorney by the appellee alone, and at the same time is drawn an obligation by which he covenanted to support and protect the intestate during life. The conveyance and the covenant are delivered to the appellee; and the conveyance is executed at his residence, in the presence of, and attested by, witnesses of his selection. At the time of its execution the intestate said, according to the evidence of one of the subscribing witnesses, she wanted and intended the appellee to have *that property, to pay him for what he had done, and to pay him for taking care of her when she got so she could not take care of herself.* The other witness says she expressed her gratitude for the kindness of the appellee, and said she intended he should have her property, *that he was to take care of her.* The recital of consideration in the deed is, "of the sum of ten dollars to her in hand paid by the said E. F. Lanier, as well as in consideration of the esteemed friendship and affection the said Ann Campbell bears to the said Lanier, for his kindness and childlike devotion to her." It strips her of all property, and rights of property, and contains no covenant or stipulation binding the appellee to her support; and if the separate covenant prepared by the attorney, at the time of preparing the deed, was ever executed or delivered, it has not been proved.

The only explanation of the motives of the deceased for the execution of the conveyance, is affection for the appellee, inspired by his kindness to her in her last years. The same explanation has been attempted in nearly all the cases in which conveyances of this character have been assailed. Affection to the appellee was not the only motive with the intestate for the execution of the conveyance. Security to herself of a comfortable support was also a motive. The appellee must have promised to afford her such security, otherwise he would not have caused the attorney who drew the deed under his supervision and instruction, to draw a

covenant or obligation binding him to her support. Why this instrument was not executed at the same time of the execution of the deed, or why it was never executed, is unexplained. No faithful agent would without advising against it, when it was within the line of his duty, have permitted a principal, aged, infirm in body and intellect, to have parted with his entire estate, absolutely and unconditionally, reserving no means of, and no security for a support, without at least advising against it. Certainly, he would have been unfaithful, if he had been active in encouraging and promoting the act. We do not propose dwelling further on the facts. No conveyance ever fell more directly within the principles on which such conveyances are pronounced fraudulent; and it is not "possible for a court of equity, consistent with its rules and principles, and the landmarks of its authority for ages together, to admit of its standing."—*Wells v. Middleton*, 1 Cox Ch. Cases, 118.

The decree of the Chancellor must be reversed, and this court, proceeding to render the proper decree, doth order, adjudge and decree, that the conveyance executed by Ann Campbell to the appellee, Lanier, of date July 20, 1872, attested by G. W. Moore and T. J. Kennedy, and acknowledged before T. J. Kennedy as notary public of Chambers county, is null and void. And within ten days after notice of this decree, to him or his solicitor of record, the appellee Lanier will surrender said deed to the register of the Court of Chancery, who will cancel the same.

It is further ordered, adjudged, and decreed, that within ten days after this decree, the said appellee Lanier surrender to the appellant possession of the lands described in said conveyance, and on his failure or refusal so to do, the register, on the request of the appellant, will issue a writ of assistance, directed to the sheriff of Chambers county, commanding him to place the appellant in possession of said lands. If the appellee, or any tenant of his, has a crop growing on said premises, the execution of said writ of possession may be stayed, on the execution of a bond payable to the appellee, with two good and sufficient sureties, for the payment of the rent of the present year.

It is further ordered, adjudged and decreed, that it be referred to the register to take and state an account against the appellee, Lanier, of the rents and profits of said lands, annually, from the 5th day of April, 1870, to the time possession may be surrendered to the appellant, computing interest on such rents from the expiration of each year, first crediting the appellee with all taxes on said lands he may have paid, and with the value of all necessary repairs and

[Waddell, Adm'r, v. Lanier et al.]

improvements, if any, he may have made, and then ascertaining the balance.

It is further ordered, adjudged and decreed, that said register take and state an account of all personal property and its value, of all choses in action, and of all moneys the appellee may have received under said conveyance, or as agent for the intestate, or from, or as the agent of James Campbell, in his life. That said appellee be charged with the value of all such property, other than choses in action and money, at the time it was received by him; and with all such of the choses in action as he may have collected, or which he may have failed to collect from a want of diligence, and with all moneys owing by him to the intestate, or to said James Campbell in his life, and that interest be computed on the value of said personal property, from the time it was received, and on such choses in action from the time of their collection, and on the moneys from the time they may have been received; and will allow him a credit for all moneys necessarily expended for said Ann Campbell, with interest from the time they may have been paid out; then ascertaining the balance. In executing the reference the register may use the evidence on file and may receive such other legal evidence as the parties may introduce. And the register will report his action, under this decree, to the Chancellor for confirmation. The appellee, Lanier, must pay the costs of this appeal in this court, and the costs of the Court of Chancery.

STONE, J.—I agree fully with the Chief Justice in all he has said of the legal principles which govern this case. Both the original and amended bills are very full, and each has attached to it interrogatories that are full and exhaustive, and cover every phase of the transaction, as charged. Each calls for an answer from Lanier under oath, both as to the charging parts of the bills and to the interrogatories. The answers are very full, responding to every material averment and inquiry, and emphatically negative every charge or semblance of fraud, circumvention, and undue influence. If the answers be true, there is no ground on which the deed should be set aside. According to them, a more complete case of voluntary conveyance was never presented in a court of justice. The complainant had the option of making Lanier a witness, by calling for a sworn answer, and he chose to exercise it. Doing so, he has expressed confidence in him, and has thus placed himself at the disadvantage of being required to overcome the denials in the answer by the testimony of two witnesses, or one with corroboration.—1

Brick. Dig. 738, § 1466. Has he done so? Examining the evidence, it must be confessed that the average intelligence of defendant's witnesses stands above that of complainant. The complainant submitted his cause on the pleadings, and ten depositions. The defendant, on pleadings and eight depositions. Three of defendant's witnesses were physicians of many years practice. The testimony, altogether, shows beyond peradventure that Mrs. Campbell had sufficient mental capacity to make a deed; and the witnesses who attested it, prove that at the time she executed it, she fully comprehended its terms, and carried out her own wishes in executing it. Other witnesses prove her previously and subsequently expressed purpose to so convey her property. These acts and declarations were in the absence of Lanier. Lanier denies positively that the deed was made at his instance or request, and there is an entire absence of proof to overcome this denial, or to show that a word or hint ever escaped him, tending in the least to show that the deed was of his procuring. True, Lanier was kind and tender in his attentions to Mrs. Campbell. He was her agent, and had charge of all her business. The proof fully shows that Mr. Campbell, husband of Mrs. Campbell, before his death, which had then recently occurred, had great confidence in and friendship for Lanier—shown by repeated declarations of Campbell, by depositing his money with him for safe keeping, and by making Lanier's business house his stopping place when he visited the village. The uncontested facts furnish very ample reason why Mrs. Campbell, in her then lonely condition, should desire to have Lanier for her agent. The known confidence in him indulged by her husband, then recently deceased, and whose memory she cherished, would most naturally suggest him as the most suitable person to be her agent.

It is objected, however, that Mrs. Campbell first appointed Hill to be her agent, and very soon afterwards displaced him, when she appointed Lanier in his stead. There is much proof in the record of Mr. Campbell's distrust of Hill's solvency and trustworthiness, although there is some the other way. The record contains proof that Hill was embarrassed, and there is no attempt to prove the contrary. If it be objected that Lanier betrayed indecent haste in accepting the agency of Mrs. Campbell's business so soon after the death of her husband, the answer is that Hill exhibited still greater haste; for he was appointed several days before Lanier was. I do not think there is any thing in this objection; for Mrs. Campbell needed the services of an agent immediately.

None of the testimony shows that either Mr. or Mrs. Campbell left any known relative, except Mrs. Hopkins, Mrs. Campbell's niece. There is proof, even in the testimony for complainant, that she became dissatisfied with Mrs. Hopkins long before she made the deed to Lanier. There is an entire absence of proof as to the cause of this dissatisfaction, unless it be shown in the testimony of complainant's witness, to the effect that Mrs. Campbell had learned or heard that Mrs. Hopkins had said she was going to have all of Mrs. Campbell's property she could get. Such remark is apt to offend. We are entirely uninformed whether Mrs. Hopkins made this remark, generally regarded as unfeeling; or how Mrs. Campbell was informed she had made it. If Mrs. Campbell believed her niece had so expressed herself, the probable tendency was to cool her affection for her. There is, then, nothing left but the kind offices and tender attentions shown by Lanier to this aged lady, the lonely relict of his confiding friend, on which to rest the charge of fraud, undue influence, or abused confidence. Is it enough to overcome the responsive denials in his answer? Are acts of kindness, child-like attention, if you please, badges of fraud? Tenderness to the aged has always been regarded as one of the virtues of a high civilization; and gratitude a common instinct of humanity, the want of which deserves and receives universal condemnation. Shall the one be denounced as covinous, and the other reprobated, and its legitimate expression nullified, for no other reason than that in this transaction, humanity is exhibited in its highest and most ennobling attributes; and this, over the unimpeached and unassailed testimony of the defendant's denials in his answer, which the complainant made evidence for him, and offers nothing but defendant's kind offices to overturn? I fully adhere to the principle that confidence acquired shall not be betrayed, but am unwilling to carry it to the extreme length of repugning or condemning the gentler amenities of a refined and elevated civilization.

It is objected that the record fails to show that Lanier executed the agreement, binding himself to support Mrs. Campbell during her life. If this question was mooted in the court below, the record does not inform us of it. But there are other answers to this objection. I do not understand it to be denied by the Chief Justice that Mrs. Campbell was of sound mind, capable of making a binding contract, and it follows that this contract can not be annulled on the ground of her mental imbecility. The only subject of inquiry is, did Lanier abuse the trust and confidence she reposed in him? And did he execute his part of the mutual agreement? The first branch of this inquiry is answered above. In

regard to the second branch, if Lanier's failure to bind himself to support Mrs. Campbell is a good ground for setting aside her conveyance now, it was equally good and available to her in her lifetime. If she had sought to rescind on that ground, it would have been a complete answer to the suit for Lanier to show a readiness, willingness, ability and offer to execute such contract, and to support Mrs. Campbell during her life. And, having done all he agreed to do, in supporting Mrs. Campbell during her life in a style suited to her tastes and social standing, if a suit were brought against him for a breach of his promise to execute a binding contract to support her, the recovery would at most be nominal. The gist of the undertaking was, not that he should bind himself, but that he should in fact support her. That being done, no actual injury has resulted to her from his failure, if fail he did, to execute the writing. The case is analogous to a sale and conveyance, with cotemporaneous agreement by the purchaser to execute a note for the purchase money. Should he fail to do so, but yet pay the purchase money according to the terms of the agreement, the vendor would have sustained no injury, and could neither rescind the contract nor recover for its breach. So, in this case, Lanier's failure to execute the agreement furnishes no cause of action, after he has performed all the agreement would have bound him to do. In any aspect in which I can view this case, I can not concur in the views of my brother, the Chief Justice.