# Noble's Adm'r *v.* Moses Brothers.

*Bill in Equity to Vacate Judgment, and for Account and Redemption under Mortgage.*

1. *Transactions between father and daughter; equitable relief against.* Business transactions between a father and his unmarried daughter, who continues to reside with him as a member of his family, though her legal disabilities have been removed and she has attained her majority, by which she assumes a pecuniary obligation for his benefit, are regarded in equity as transactions between persons occupying a fiduciary relation towards each other, and will not be sustained or enforced, unless the presumption of undue influence is rebutted, and it is shown that the daughter acted with full knowledge of the facts, and had independent legal advice; and the person who advances money to the father on the credit of the daughter, under such circumstances, having

[Noble's Adm'r v. Moses Brothers.]

knowledge of the facts, occupies no higher or better position than the father.

2. *Same; case at bar.*—The complainant in this case, who had just attained her majority and was unmarried, was possessed of a considerable estate, while her father was insolvent, and she continued to reside in his family; he having also been her guardian until the removal of her legal disabilities in her 20th year. The father had been cultivating several plantations, which belonged to the complainant and his other children, and had become indebted to the defendants for moneys advanced to enable him to make a crop; and at the end of the year, they declining to make advances to him for another year, it was agreed between them that, with his daughter's consent, they would make the necessary advances, not exceeding $500 per month, on her credit, the business to be conducted in her name, by and through the father as her agent. The daughter assented to this arrangement, as explained to her by her father; the advances were furnished, a mortgage on the stock and crops being taken as security, and the farming operations resulted in a loss of several thousand dollars, after selling the crops. At the beginning of the next year, the defendants again agreed to make the necessary advances for the year, but required that complainant should give a mortgage for the past indebtedness, as well as for the future advances; and this was done, the indebtedness being stated at over $13,000. This sum included an item of $2,000, unpaid balance of the father's original indebtedness, and an item of over $5,000, on account of losses sustained on another plantation cultivated by him the preceding year; which items were within the terms of the agreement between the father and the defendants, but were not known by the complainant to be included, no explanation being given to her as to these items, and she signing the papers as prepared for her signature. At the close of the year, further losses having resulted from the farming operations, defendants required a confession of judgment for $13,000, as a condition on which they would make advances for the next year; and complainant accordingly accepted service of a writ, and copied a letter, which had been furnished by her father, instructing an attorney to confess judgment for her, which he did. In all these transactions, there was no personal interview between the complainant and the defendants, everything being done through the father as her agent,—*Held*, on these facts, that the complainant was entitled to equitable relief against the mortgage and the judgment, to the extent of the two items of $2,000 and $5,000.—(Overruling *Noble v. Moses Brothers*, 74 Ala. 604; SOMERVILLE, J. dissenting )

3. *Variance; cumulative facts not changing relief.*—When the bill alleges that the complainant's father acted as her agent in all the transactions with the defendants, as to which relief is sought on the ground of constructive fraud, and the same relation is declared in all the writings, while the evidence shows that, in fact, all the transactions were intended for the benefit of the father, who was insolvent, the complainant being his surety merely, the variance is immaterial, the evidence being an intensification of ground of relief.

APPEAL from the Chancery Court of Montgomery.
Heard before the Hon. JNO. A. FOSTER.

The opinion states all the material facts. The former appeal in this case will be found in 74 Ala. 604.

GUNTER & BLAKEY, for appellant.—(1.) The theory of the

bill is, that Micou acted, in the transactions sought to be impeached, as the agent of the complainant, his daughter, and took an undue advantage of his position and parental influence ; and that Moses Brothers, having knowledge of the facts, can not claim any benefit from these transactions, without showing that she had independent advice, and acted with full knowledge of all the facts as they actually existed.    In all the papers executed between the parties, Micou was recognized as the agent, and the complainant as the principal; and though in fact Micou was the principal, all the profits of the business being intended for his benefit, and the complainant was his surety, this can not affect the right to relief, nor vary the nature or extent of the relief granted.    (2.) The relation between the complainant and her father was one of trust and confidence, and any transactions between them are governed by the rules which a court of equity always applies to business dealings between persons who occupy a fiduciary relation towards each other ; they are scrutinized with jealous care, and the presumption of undue influence must be rebutted, before the parent, guardian or other trustee can reap any benefit from them.    Under the facts proved, the complainant's right to relief against Micou can not be doubted.—*Haguenin v. Basely,* 2 L. C. Eq., 589 ; *Maitland v. Backhouse,* 16 Sim. 66 ; *Maitland v. Brown,* 15 Sim. 437 ; *Archer v. Hudson,* 7 Beav. 552 ; *Rhodes v. Bate,* Law Rep., 1 Ch. Ap. 252 ; *Corbett v. Brock,* 20 Beav., 524 ; *Turner v. Collins,* 2 Eng. Rep., Mock, 290 ; *Wright v. Vanderplank,* 8 DeG., M. & G. 135 ; *Malone v. Kelly,* 54 Ala. 532 ; *Judge v. Wilkins,* 19 Ala. 771 ; *Johnson v. Johnson,* 5 Ala. 94 ; *Jouzan v. Toulmin,* 9 Ala. 684 ; *Thompson v. Lee,* 31 Ala. 304 ; *Waddell v. Lanier,* 62 Ala. 347 ; *Lanier v. Hill,* 52 Ala. 430 ; *Holt v. Agnew,* 67 Ala. 360 ; *Dickerson v. Bradford,* 59 Ala 581 ; *Parfit v. Lawless,* Law Rep., 2 P. & D. 465 ; *Oliver v. Piatt,* 3 How. 363 ; *Whelan v. Whelan,* 3 Cowen, 537 ; *Beaumont v. Boulthee,* 7 Vesey, 616 ; 10 S. & M. 173 ; 1 P. Wms. 118 ; 2 Pomeroy's Equity, § 962, and notes. (3.) Moses Brothers, acting with full knowledge of the fiduciary relation, can not occupy a better or higher position than Micou, unless they show that the complainant had independent legal advice, and understood what she was doing. *Espy v. Lake,* 10 Hare, 262 ; *Houghton v. Houghton,* 15 Beav. 278 ; *Savery v. King,* 5 H. L. Rep. 627 ; *Archer v. Hudson,* 7 Beav. 551 ; *Maitland v. Brown,* 15 Sim. 437 ; *Maitland v. Backhouse,* 16 Sim. 66 ; *Boney v. Hollingsworth,* 23 Ala. 698 ; 2 L. C. Eq. 1189–90, 1261 ; *Collinson v. Lister,* 2 DeG., M. & G. 633 ; *Rhodes v. Bate,* Law Rep., 1 Ch. Ap. 252 ; *Kempson v. Ashbee,* 10 Ch. App. Cases, 19 ; *Oliver v. Piatt,* 3 How.,

363 ; *Atwood v. Wright,* 29 Ala. 351 ; *Whelan v. McCrary,*
64 Ala. 325.   (4.) If the facts had been known, they would
not have constituted a defense at law against the judgment;
and not being then known, negligence can not be imputed
to the complainant in not filing her bill before its rendition.
As a bill for equitable relief against a judgment at law, the
complainant brings herself within the rule which requires
that the party must show a meritorious defense, which he
could not make at law, and must acquit himself of negligence.
Freeman on Judgments § 250 ; 64 Ala. 319 ; 34 Ala. 596 ; 8
How. 199 ; 20 Conn. 544 ; 3 Md. Ch. 392 ; 1 John. Ch. 320.

TROY, TOMPKINS & LONDON, *contra,* argued the various
points of the case *in extenso ;* citing their brief filed in the
case on former appeal, reported in 74 Ala. 604, and the
opinion of the court in said cause.

STONE, C. J.—Lucy B. Noble, *nee* Lucy B. Micou, at-
tained to her majority October 30, 1874.  She had been
relieved of the disabilities of minority by chancery decree
rendered about twelve months before that time.  She had a
pretty large independent estate inherited from her deceased
mother, and her father, B. H. Micou, was the guardian of
her estate until she was so relieved of the disabilities of
minority.  She was a member and inmate of her father's
family until her marriage in October, 1879, and we are not
informed that any charge was made against her for board.

B. H. Micou had been reputed to be a man of large wealth;
but in 1874 he sustained financial reverses, was ruinously
insolvent, and without credit.  He had, through property
of his wife—a second marriage—and the forbearance of his
children, the use and control of two or more large planta-
tions and the stock upon them, but he was without means
or credit to conduct farming operations.  Moses Brothers,
real estate agents, and having good credit, advanced for him
without security during 1874, and thus enabled him to con-
duct his farming operations and to support his family.  At
the close of that year Micou fell indebted to them in the
sum of thirty-six hundred dollars over and above what the
crop yielded.

At the commencement of the year 1875 Moses Brothers
were unwilling to advance further to B. H. Micou on his in-
dividual credit, and they so informed him.  After some ne-
gotiations between B. H. Micou and Moses Brothers,
through one of their firm, it was agreed between them that
the planting operations on the Prairie-Wollahatchie planta-
tion, and on the Campbell plantation, should then be con-

ducted in the name of Lucy B. Micou, and that she should give a crop lien and mortgage on the stock and crops to be grown to secure the same. Only two witnesses, B. H. Micou and one of the Moses Brothers, speak of the terms of this agreement. B. H. Micou's testimony is as follows :

"Moses Bros., at or about the close of 1874 or first of 1875, required some security for the balance due them by me at that time, and for the advances to be made to support my family and other expenses, and to make a crop in 1875, as a condition for extending the indebtedness, and for making further advances. The matter was talked over between Moses Bros. and myself, and Lucy being the only member of my immediate family who was in a condition to assume any responsibility, it was decided between us that I should obtain her consent to have the planting interest run in her name, and the stock, farming implements and provisions on the Prairie and Wollahatchie plantations, which had been bought in for the benefit of my wife, should be transferred to her, and the busines carried on in that way by me as her agent."

The testimony of Moses : "Micou did desire to obtain advances to make a crop in 1875. At the time we agreed to make these advances for 1875, he stated that his daughter, Miss Lucy B. Micou, was willing for the planting to be conducted in her name and on her responsibility, and that she would assume payment of the balance of the account for 1874, and execute a mortgage to secure the balance of 1874 against B. H. Micou, and the advances to be made in 1875 for planting purposes, and B. H. Micou's family expenses, for taxes and insurance and other purposes. This was agreed to, but before the papers were executed, Mr. Micou stated, and it was agreed between us, that he should conduct the business on the Prairie, Wollahatchie and Campbell places as before stated, and on the Shorter place in the name of F. S. Boykin, who was to execute a mortgage to secure advances for that purpose ; but with the further understanding that any profits on that place should be credited to the account of L. B. Micou at the close of the year, and losses, if any, should be debited to her account."

The agreement spoken of by these witnesses was drawn up in writing, and bears date March 3, 1875. B. H. Micou procured the execution of it by Lucy B. Micou. Its recitals are as follows : "Whereas, I am justly indebted to Moses Brothers in the sum of three thousand dollars; and whereas the said Moses Brothers have agreed to furnish to me through my agent, Benjamin H. Micou, certain advances of meat, planting utensils, bagging and ties, and money to

purchase other necessaries and supplies to enable me to carry on certain planting operations in said State and county, that I am now conducting on the plantations lately owned and occupied by Benj. H. Micou, and known as the Prairie and Wollahatchie plantations and the Campbell plantation; and which are necessary to enable me to make a crop on said plantations. Also advances of money and supplies to my agent, Benjamin H. Micou, for family support during the time of his attention to said business, and money to pay necessary taxes and expenses—said advances to be furnished from time to time, in amounts not to exceed altogether the sum of five hundred dollars per month during the present year." Said agreement then proceeded to convey to said Moses Brothers the stock of mules and horses on said places, and the crops of cotton and corn to be grown thereon during the year 1875, by way of mortgage, to secure said indebtedness and advances.

At the close of the year 1875 Moses Bros. were again unwilling to advance farther without other and real security. It was then agreed between them and B. H. Micou that Lucy B. Micou should execute to them a mortgage on real estate to secure the balance due to them, which was agreed on at the sum of thirteen thousand four hundred and sixty dollars. Thereupon a note for that sum was drawn up, due December 1, 1876, and bearing interest from date, and a mortgage on real property as security for its payment; each of which papers B. H. Micou procured Lucy B. Micou, his daughter, to execute, bearing date February 7, 1876. The mortgage conveyed her undivided half interest in certain real estate in the city of Montgmery, in the Campbell plantation, and also conveyed certain personal property and crops to be grown that year. The mortgage contained a power of sale on default.

In the reckoning and settlement which produced the balance of thirteen thousand four hundred and sixty dollars, certain items of debit were included which constitute the chief contention in this suit. Among these are the following: Two thousand dollars of the thirty-six hundred left unpaid by B. H. Micou at the close of the year 1874. This was charged against Lucy B. Micou in the account of 1875, as of the first of that year. At the close of the year there was an ascertained deficit on the Shorter plantation of five thousand and twelve dollars. That plantation had been cultivated in the name of one Boykin, but controlled by B. H. Micou. These two sums, with interest on the two thousand dollars, entered into the ascertained balance of thirteen thousand four hundred and sixty dollars, for which the

note and mortgage were given. Moses, the witness, testi-fies that this was in accordance with the agreement with B. H. Micou, and the latter does not controvert it.

At the close of the year 1876, Moses Bros. interposed other objections, and exacted a change of security, as a con-dition of further indulgence, and of further accommodations. The requirement at this time was that thirteen thousand dollars of the debt, with some interest, should be placed in judgment against Lucy B. Micou. This B. H. Micou agreed to, and it was done accordingly ; the judgment bearing date February term, 1877, of the City Court of Montgomery, and for the sum of thirteen thousand and fifty-three 35-100 dol-lars. In form the judgment is on jury and verdict, but the proof shows it was taken by consent. In the testimony of Moses, the witness, is the following language : " It was our purpose in part in having the judgment taken to cut off all further inquiry into the account." It is shown they had taken legal advice.

In 1881 Moses Bros. attempted to force the collection of their said judgment by execution, and thereupon Lucy B. Noble filed this bill in January, 1882, and seeks to have the account overhauled and corrected.

As we understand the purpose and prayer of the bill, it does not seek to repudiate any proper expense incurred in the cultivation of the plantations, in the maintenance of B. H. Micou's family, in the payment of taxes, and in other expen-ditures incidental to these, and to the preservation and pro-ductiveness of the property. It concedes the liability of herself and her estate for meat, planting utensils, bagging and ties, and money to purchase other necessaries and sup-plies to carry on the planting operations to be conducted in her name and on the plantations named in the agreement. It also concedes a liability for B. H. Micou's family support during the time of his attention to said business, and money to pay necessary taxes and expenses—said advances to be furnished from time to time, in amounts not to exceed al-together the sum of five hundred dollars per month during the year—the alleged indebtedness for which constituted the basis of the mortgage and of the judgment. The chief purpose is to eliminate from the debit column of the ac-count the two items of two thousand dollars and five thousand and twelve dollars described above, all other charges not falling within the classes for which she had bound herself, and all excess of interest charged above eight per cent.

Situated as B. H. Micou and his daughter then were—he financially ruined, and she in affluent circumstances—there was something beautiful as well as natural in the filial spirit

she manifested.    A reasonable family settlement under such
circumstances finds no condemnation in that high, yet con-
servative morality, which the court of chancery inculcates
and administers.    It is only when confidence is abused that
courts of conscience interfere.    But we need not decide this.
*Frank v. Frank,* 1 Ch. Cas. 84 ; *Beckley v. Newland,* 2 P Wms.
182 ; *Stapilton v. Stapilton,* 1 Atk. 2 ; *Pullen v. Ready,* 2 Atk.
592 ;  *Cory v. Cory,* 1 Ves. Sr. 19 ;  *Kinchant v. Kinchant,* 1
Bro. C. C. 369 ;  *Tendril v. Smith,* 2 Atk. 85 ;  *Wyherly v.
Wycherly,* 2 Eden, 175 ; *Houghton v. Houghton,* 15 Beav. 278 ;
*Brown v. Carter,* 5 Ves. 892 ;  *Tweddell v. Tweddell,* Tur. &
Russ. 1 *Cooke v. Burtchaell,* 2 Dru. & War. 165 ; *Hannah v.
Hodgscn,* 30 Beav. 19 ;  *Parfitt v. Lawless,* 2 Courts Prob. &
Div. 462 ; *Blackie v. Clark,* 15 Beav. 595.

The theory on which relief is claimed in this case is, that
when these transactions were entered upon, complainant,
the daughter and ward of B. H. Micou, had just reached her
majority, and was still a member of his family ; that any
contract she may have made with her father, by which she
incurred a heavy responsibility, or parted with a valuable
interest, for his use or accommodation, will be referred to
improper control and parental restraint, and does not bind
her, unless all imputation of undue influence is repelled by
the proof ; and that Moses Bros., being cognizant of the re-
lation of the parties, past and present, knowing complainant's
age and surroundings, stand in no better right than B. H.
Micou would, if he were claiming relief for his own benefit.
It is claimed that no testimony has been offered disproving
such parental influence, or tending to show that Lucy B. Micou
had any outside advice, or that she executed the papers of
her own free will, or that any explanation was made to her,
informing her of the nature and effect of the contracts she
was entering into.

Boykin, brother-in-law of complainant, and an inmate of
the family, in 1876, after she had executed the note and
mortgage and the latter had been recorded, inquired of her
if she knew the extent to which she had bound herself
and her property, and then informed her of the amount.
She expressed surprise that her father should treat her so.
It is shown that Micou resented with some feeling Boykin's
interference in the matter.    It is not shown that Boykin
gave complainant any information as to the items compos-
ing the indebtedness.    It is shown that he did not inform
her that the two items of two thousand and five thousand
and twelve dollars were included in the account, for he did
not know it himself.    With the foregoing exception, all the
testimony found in the record shows Lucy B. Micou, while

entering into these solemn contracts and engagements, was brought in contact only with her father; that the papers she executed were never explained to her farther than by reading them over to her; that the accounts of the several years' transactions were never so much as shown to her, and that when papers were presented to her by her father for execution, she executed them without inquiry, and in trusting, filial confidence.

It is shown that until shortly before the present bill was filed—January, 1882—Miss Micou had never been informed, and did not know that two thousand dollars of her father's deficit for 1874 had been charged to her, and entered into the sum for which she gave her note and mortgage in February, 1876. And not until after her bill was filed did she learn that the five thousand and twelve dollars, deficiency in the crop grown on the Shorter place, was also charged to her account, and entered into the sum she had secured by note and mortgage. This last named item is the subject of an amendment to her bill. It is shown, however, by Moses Bros. and admitted by B. H. Micou, that one of the conditions on which they agreed to advance and did advance for 1875, was that the unpaid balance for 1874 — thirty-six hundred dollars — should be secured. Another fact shown and not denied is, that it was part of the agreement on which the Shorter place was worked in the name of Boykin in 1875, that if there should be an excess of debits for advances over payments realized from that place, such excess was to be charged to L. B. Micou. This excess constitutes the item of five thousand and twelve dollars charged to complainant's account for 1875. There is no proof that L. B. Micou was ever notified of either of the agreements. The written contract of March 3, 1875, —the commencement of the dealings—makes no reference to either of them. The testimony is, that at the close of the crop year of 1875, B. H. Micou informed complainant, as the result of the year's planting, that she had fallen in debt thirteen thousand four hundred and sixty dollars; and upon his requesting her to do so, she gave her note and mortgage to secure its payment.

Would this transaction stand, if B. H. Micou himself were seeking to enforce the contracts against complainant and her property? In *Archer v. Hudson*, 7 Beav. 551, Lord LANGDALE said: "Everybody will affirm in this court that if there be a pecuniary transaction between parent and child just after the child attains the age of twenty-one years, and prior to what may be called complete emancipation, without out any benefit moving to the child, the presumption is that

undue influence has been exercised to procure that liability
on the part of the child, and it is the business and duty of
the party who endeavors to maintain such a transaction, to
show that the presumption is adequately rebutted, and that
it may be adequately rebutted is perfectly clear.   This court
does not interfere to prevent an act even of bounty between
parent and child, but it will take care (under the circum-
stances in which the parent and child are placed before the
emancipation of the child,) that such child is placed in such
a position as will enable him to form an entirely free and
unfettered judgment, independent altogether of any sort of
control." .

   In *Houghton v. Houghton,* 15 Beav. 278, 299, Sir JOHN
ROMILLY said :  "In many cases the court, from the rela-
tions existing between the parties to the transaction, infers
the probability of such undue influence having been exerted.
There are cases of guardian and ward, of solicitor and
client, spiritual director and pupil, medical adviser and
patient, and the like ; and in such cases the court watches
the whole transaction with great jealousy, not merely for
the purpose of ascertaining that the person likely to be so
influenced fully understood the act he was performing, but
also for the purpose of ascertaining that his consent to per-
form that act, was not obtained by reason of the influence
possessed by the person receiving the benefit ; not that the
influence itself, flowing from such relations, is either blamed
or discountenanced by the court; on the contrary, the due
exercise of it is considered useful and advantageous to
society ; but this court holds, as an inseparable condition,
that this influence should be exerted for the benefit of the
person subject to it, and not for the advantage of the per-
son possessing it.   The case of parent and child is undoubt-
edly one of this class of cases, and it is prominently put
forward as such in all cases illustrating this principle."
*Heron v. Heron,* 2 Atk. 161 ; *Carpenter v. Heriot,* 1 Eden.
338 ; *Cocking v. Pratt,* 1 Ves. Sr. 401 ; *Hawes v. Wyatt,* 3
Bro. C. C. 156 ; *Huguenin v. Baseley,* 14 Ves. 273, s. c. and
notes, 2 Lead. Cas. in Eq. (4th Amer. Ed.) 1156.   In that
excellent treatise, Pomeroy's Eq. Ju., Vol. 2, § 956, is this
language :   "While equity does not deny the possibility of
valid transactions between the two parties, yet because
every fiduciary relation implies a condition of superiority
held by one of the parties over the other, in every transac-
tion between them by which the superior party obtains a
possible benefit, equity raises a presumption against its
validity, and casts upon that party the burden of proving
affirmatively its compliance with equitable requisites, and

of thereby overcoming the presumption." In *Rhodes v. Bate*, L. R. 1 Ch. Ap. Cas. 252, 257, Sir J. G. TURNER, Lord Justice said : " I take it to be a well established principle of the court, that persons standing in a confidential relation towards others cannot entitle themselves to hold benefits which those others may have conferred on them, unless they can show to the satisfaction of the court that the persons by whom the benefits had been conferred had competent and independent advice in conferring them." Such has been the almost unbroken current of decisions on each side of the Atlantic, from the very dawn of well defined English Equity Jurisprudence.—1 Sto. Eq. Ju. § 307.

Alabama, at an early day, placed herself squarely abreast with England and with her sister States, on the question we have in hand. In *Johnson v. Johnson*, 5 Ala. 90—decided in 1843—this court said : " Contracts made by persons between whom the relation of trustee and *cestui que trust* exists, are viewed with so much jealousy by courts of chancery, that they are voidable by the latter if, within a reasonable time, he seeks to set the contract aside, and can be supported only when the trustee, previous to the contract, has made such a full disclosure of all the facts and circumstances which have come to his knowledge as trustee to the *cestui que trust*, as to enable the latter to deal with him on equal terms." In *Malone v. Kelly*, 54 Ala. 532, the language of the court is, that " if either of the known legal relations of guardian and ward, trustee and *cestui que trust*, attorney and client, or any other relation in which a confidence is reposed and accepted, or influence acquired, exists between the parties, on him to whom the confidence is extended, and who has acquired the influence, if he claims the benefit of the contract, the law, on a principle of public policy, casts the duty of proving its fairness, and that it is untainted with a violation of the confidence reposed, or an undue exercise of the influence of the relation." In *Voltz v. Voltz*, 75 Ala. 555, this court said : " Even if the relation of trustee and beneficiary has terminated, courts regard with distrust and *prima facie* disapprobation all dealings in property between them, until a sufficient time has elapsed for all presumption of undue influence to have ceased. And there are sound reasons for such a rule. The trustee stands as a guardian, protector, and in many cases the adviser of the *cestui que trust*. He must bestow the same care, diligence, and watchfulness upon the personal and pecuniary interests confided to him, as an ordinarily prudent man bestows on his own similar interests. He is on watch, not of his own, but of another's property rights. He should not, and can

not rightfully strike a bargain with his beneficiary, which he would not advise and approve, if proposed by a stranger; and when he attempts to deal with his beneficiary, he is placed in the repugnant, dual attitude of being forced by duty to give his counsel, watchfulness, best judgment, and trading capacity to another, against his own personal pecuniary interest, if antagonistic."—*Juzan v. Toulmin,* 9 Ala. 662; *Boney v. Hollingsworth,* 23 Ala. 690; *Thompson v. Lee,* 31 Ala. 292; *Cleveland v. Pollard,* 37 Ala. 556; *Dickinson v. Bradford,* 59 Ala. 581; *Waddell v. Lanier,* 62 Ala. 347; *Shipman v. Furniss,* 69 Ala. 555.

There can be no question that if this were a contention between B. H. Micou, the father, and Lucy B., the daughter, the contracts would be set aside, as presumptively obtained by undue parental influence.

In Perry on Trusts, § 201, is found this language: "The law . . . does not presume in the first instance that a parent would make use of his authority and parental power to coerce, deceive, or defraud the child. Therefore it is always necessary to prove some improper and undue influence in order to set aside contracts between parents and children." The only authority he cites which sustains him is *Jenkins v. Pye,* 12 Pet. 241. The majority opinion, delivered by THOMPSON, J., is confessedly opposed to the English authorities, and is supported by no ruling cited by its author. None can be found which agrees with him, so far as our investigation has extended. The bill was fatally bad on the ground of staleness, and was rightly dismissed for that reason. Judge CATRON, while concurring in the conclusion, filed an able opinion, in which he dissented entirely from the principle announced above. In the later case of *Taylor v. Taylor,* 8 How. 183, the case of *Jenkins v. Pye* was reviewed and explained, and its authority, at least, impaired. And the case of *Allore v. Jewell,* 94 U. S. 506, as we understand it, departs entirely from the principle declared in the case of *Jenkins v. Pye* by Thompson, J., and follows the English doctrine declared above. Speaking of the case of *Jenkins v. Pye,* the learned author of the American notes to the fourth edition of Leading Cases in Equity, Vol. 2, p. 1205, says: "But for the last mentioned ground (staleness) this judgment could scarcely be reconciled with the general course of decision."—See collection of authorities by him, pp. 1192 to 1204. And in 2 Pom. Eq. 495, note 3, that great and painstaking author takes decided ground against the soundness of the ruling in *Jenkins v. Pye.*

It may as well be stated here, as elsewhere, that this record contains no evidence that either Boykin or any one

else ever informed Miss Micou, until after her marriage, and her husband obtained counsel, that she had any show of defense against the note and mortgage, on the ground of imputed undue influence.— *Voltz v. Voltz*, 75 Ala. 555.

Have Moses Bros. a better footing than would B. H. Micou have if he were suing?

The only witness examined for Moses Bros. was one of the firm. He testified that the firm had no personal interview with L. B. Micou, the daughter, and that all their dealings with her had been through B. H. Micou, her father, styled in the papers her agent. They had no knowledge of the communications made to her, save that evidenced by the papers she executed. In his testimony is the following language : "We knew that complainant was 22 or 23 years of age, and that before she arrived at 21 years of age a sufficient showing of her capacity to manage her own affairs was made to induce a Chancery Court to relieve her of the disabilities of non-age. . . Up to and prior to the confession of said judgment, we knew that complainant was a young woman living with her father, B. H. Micou, and that he had been her guardian until the removal of her disabilities before she became of age; and that at the time of the confession of said judgment she was about 23 or 24 years of age, and that said B. H. Micou was insolvent. . . . I regarded B. H. Micou as carrying on the business for his own benefit, but in the name and on the credit of complainant, and by her consent, and that he was authorized to make all the charges shown in said account against her estate. . . In the dealings had with us, we recognized that the plantations were carried on by B. H. Micou for his own benefit and advantage, but in the name and on the credit of L B. Micou."

In *Maitland v. Irving*, 15 Sim. 437, Maclean was indebted to Irving & Brown, and desired to obtain indulgence on the indebtedness. He had a niece living with him, Miss Maitland, whose guardian he had been. She was in her twenty-third year. The material facts and principles of the case are briefly and clearly stated by Hare & Wallace in 2 Lead. Eq. Cas. (4th Ed.), 1190, as follows : "Irving & Brown consented to postpone the payment of £5000, due to them from Maclean, in consideration of his procuring and giving the guarantee of the plaintiff, Miss Maitland, for that sum ; and Maclean at the same time informed Irving & Brown that Miss Maitland was his niece, and was possessed of considerable property; that she had resided with him for some time, that he had been her guardian, and that she had been of age about a year and a half. (The guarantee was given.)

[Noble's Adm'r v. Moses Brothers.]

Afterwards another (agreement) was made between Irving
& Brown and Maclean, in pursuance of which Irving &
Brown delivered up the guarantee, and Maclean procured
and gave them plaintiff's (Miss Maitland) check for £3000,
and her promissory note for £1200, as security for his pay-
ing them those sums. Sir L. SHADWELL, V. C., granted, and
afterwards continued an injunction, restraining Irving &
Brown from prosecuting an action against the plaintiff to re-
cover the £3000 ; and notwithstanding they had obtained a
verdict, he refused to order the money to be paid into court.
The case, said his Honor, has been argued for the defend-
ants as if it were a case in which they had some ground to
resist the rule in equity, because of their not being volun-
teers. But no consideration whatever was given to the
young lady ; on the contrary, she was induced to do the act
upon an application made to her by a person who, if he had
performed his duty, would have advised her not to do that
which he applied to her to do.  *  *  The facts of the case
seem to me to amount to this : That Irving & Brown, know-
ing the defenceless situation of the young lady, combined
with Maclean, who disclosed it to them, in order that ad-
vantage might be taken of her defenceless situation, for the
benefit of all the three. And my opinion is that all three
be considered as standing in the same situation."

In *Archer v. Hudson*, 7 Beav. 551, a niece, two months
after she came of age, and after her guardian had fully ac-
counted to her, entered into a voluntary security for her
uncle with whom she resided, to his banker, as a condition
upon which the uncle would be permitted to overdraw his
account. Hanxwell was manager of the bank. The bill
was filed by the niece, then Mrs. Archer, to be relieved of
the liability. Lord LANGDALE, Master of the Rolls, said
"It does not appear that this young lady was ever severed
from the influence which the uncle and aunt had over her,
so as to enable her to form an adequate, full and independ-
ent opinion as to what she ought in prudence to have done.
I do not mean to say that if this young lady had her
trustees, or some friend or relation of the family, or some-
body interested in her welfare, to advise and consult with
in the absence of the uncle and aunt, that the circumstance
of her situation and the circumstance of her uncle's situa-
tion might not have been such, that this court would have
said that, having entered into this liability, she should be
held by it. It might have been so ; but to say that Mr.
Hanxwell, the agent of the bank, a person with whom the
uncle was dealing, the person with whom he is carrying on
his business as customer of the bank, by explaining to an

[Noble's Adm'r v. Moses Brothers.]

inexperienced young woman, who had just attained her age of twenty-one years, the meaning of this note, offered anything like such a protection as would secure to her that free and independent judgment which she had a right to exercise, seems to me to go far beyond anything which has been proved in this case. It does not appear to me, taking this transaction as it stands upon the evidence before me, that it can be supported.

In the last case the uncle, Daniel, had not been guardian to the young lady. The master of the Rolls found as fact, that it was "fully proved that Mr. Hanxwell was well acquainted with the relative situation of Mr. Daniel and the young lady."

In *Espy v. Lake*, 10 Hare, 260, Miss Espy had become surety for her step-father, Speakman, in a promissory note payable to Lake. The note was for borrowed money. Suit being instituted on the note, Miss Espy filed her bill to restrain its collection, after verdict had been rendered, but before judgment. Neither actual fraud, misrepresentation, nor undue influence was shown, but the case went off on the presumption the law raises from the relation of the parties. The Vice-Chancellor, in delivering the opinion of the court, said : "I take it to be quite clear that the principles of this court go to this extent—that in the case of a security taken from a person just of age, living under the influence and in the house of another person, with a relationship subsisting between such other person from whom the security is taken, which constitutes anything in the nature of a trust, or anything approaching to the relation of guardian and ward, or of standing *in loco parentis* to the surety, this court will not allow such security to be enforced against the person from whom it is taken, unless the court shall be perfectly satisfied that the security was given freely and voluntarily, and without any influence having been exercised by the party in whose favor the security is made, or by the party who was the medium or instrument in obtaining it.　.　.　.　.
It is said by Lake that he took no part in the transaction, and that he left it entirely to Speakman. I impute no moral fraud to Lake in the course of the transaction. I do not believe that there was any moral fraud on his part, nor might he have been aware of the principles which guide the court with regard to securities taken from a person in the situation of Miss Espy at that time. But what does the defendant say ? Why, that he left it wholly to Speakman. That is, he himself allowed a party standing in the relation of guardian to this young lady to persuade her to join in this security for the sum of £500. In the applica-

tion of the principles of the court, I see no distinction between the case of one who himself exercises a direct influence, or of another who makes himself a party with the guardian who obtains such a security from his ward. The defendant, Lake, left it to Speakman, who had influence over his young ward, as she may be called, to induce her to join in the security, thereby placing her more directly under undue influence than if he had applied for the security himself. Such a security can not be maintained consistently with the principles of this court." It should be remarked that Speakman was not, and never had been the legal guardian of Miss Espy.

The great case of *Savery v. King*, 5 H. of L., 627, was decided by the British House of Lords in 1856. The opinion was prepared by Cranworth, Lord Chancellor, and fully concurred in by the House of Lords. Lord Brougham, one of the peers, expressed his concurrence in a brief, separate opinion. Savery was an attorney and solicitor, and John King had been his client. Through John's influence Richard, his son, after reaching his majority, so changed the tenure of his estate as to enable him to pledge it, and actually did encumber it as security for his father, John King, to Savery. The bill was filed by Richard King, alleging undue influence, and seeking to relieve himself of the liability he had incurred for his father, and his estate of incumbrance he had placed upon it in favor of Savery. No actual fraud or intentional wrong was imputable to Savery, and the distinguished Chancellor and Ex-Chancellor each relieved him of all such imputation. The court granted to Richard King full relief. Great names appear in the argument. Among them that of Sir William Follett. This case is highly instructive in this most conservative branch of equity jurisprudence. The following cases assert substantially the same doctrine as that set forth above.—*Maitland v. Backhouse*, 16 Sim. 58 ; *Baker v. Bradley*, 7 DeG. M. & G. 597 ; *Kempson v. Ashbee*, 10 L. R. Ch. Ap. 15 ; See *May v. Le Claire*, 11 Wall. 217, 233 ; *Yonge v. Hooper*, 73 Ala. 119.

Appellees cite and rely on *Green v. Thompson*, 2 Ire. Eq. 365 ; *Nace v. Boyer*, 30 Penn. St. 99 ; *Atlantic Delaine Co. v. James*, 94 U. S. 207, and *De Ronge v. Elliott*, 23 N. J. Eq. 486. In the first three of these cases there was no fiduciary relation, and hence no question of undue influence could arise. In the New Jersey case De Ronge had taken out a policy of insurance on his life, payable to his wife at his death. It is not stated that his wife had paid the premiums, or had parted with anything that was her's. The husband became greatly embarrassed, and was arrested for debt.

35

To relieve him from the great distress of mind under which he was laboring, the wife united with the husband in an assignment of the policy to his creditors. After his death the wife exhibited her bill to restrain and enjoin the payment of the loss to the assignee. Relief was denied her, the court finding there had been no duress, and that she fully understood the transaction. The case was very like that of *Holt v. Agnew*, 67 Ala. 360.

It is claimed for appellees that all inquiry into anterior dealings between these parties was foreclosed by the rendition of judgment at the February term, 1877. The argument is, that inasmuch as appellant's intestate, Mrs. Lucy B. Noble, was represented by counsel when the judgment was rendered against her, that fact repels the presumption of undue parental influence, and renders the judgment conclusive as to all matters of debit which are embraced within it. *Corbe't v. Brock*, 20 Beav. 524, is relied on as supporting this view. In that case, the creditor required, before he would accept the security, the obligation of a Miss Colyer, that the security proposed should be read by a solicitor on her behalf. This was complied with; and, before it was accepted, the solicitor approved it on her part. It was then executed, the said solicitor being present. The court, Sir John Romilly, denied her relief from the obligation.

The present case is entirely different. Lucy B. had no counsel whatever, save that of her father, when she executed the note and mortgage. Nor had she any independent advice when she accepted service of the summons, which led to the judgment against her, although the attorney of Moses Brothers was present, and procured her acceptance of service. The only explanation then made to her, so far as this record informs us, was a statement made by her father, "that it was the same debt as the mortgage debt, and that Moses Bros. wanted to change the shape of the debt." The reason given by Moses Bros. why they wanted the claim reduced to judgment, is furnished in the following answer by one of the firm, when examined as a witness, the only testimony offered by them on the subject: "The reason why we wished a judgment instead of a mortgage was, because we could use it as a better collateral in raising money, and we considered it a more satisfactory form for the account to be in; and because it would prevent the necessity, in case of the death of either party, or in case of the marriage of Miss Micou, of perhaps having to go over all the accounts and vouchers with an executor or husband, which would involve the expenditure of great labor, time and trouble. In short, we wished a complete settlement of the account while the

matters were fresh in the minds of the parties to the trans-
actions, and such a settlement as would be final and binding
on both parties."

And it is equally true that she had no independent advice,
either before, or at the time the judgment was rendered.
All that the present record shows in relation of employment
of counsel by her, must be gathered from the following facts
shown by the record : The bill, after stating that com-
plainant's father, B. H. Micou, " undertook to obtain from
her, for them [Moses Bros.] a consent that judgment should
be rendered against her upon said note " ; and after averring
the acceptance of service by her, referred to above, charges
that " oratrix, at the instance of her said father, B. H.
Micou, wrote to D. P. B., an attorney of said court, directing
him to appear for oratrix in said cause, and consent that
said Moses Bros. should take a judgment for the amount
claimed by them to be due on said note."

The answer is very full upon most subjects, and denies all
personal influence exerted by Moses Bros. on Miss Micou.
It even denies that they ever had any interview with her in
relation to the subject-matter of this bill, or any communi-
cation with her, except through her father. It makes no
allusion whatever to the charge copied last above ; and
neither pleads nor sets up in bar of recovery, the fact that,
in the matter of recovering the judgment, Miss Micou was
represented by counsel. And defendants—appellees—offer
no testimony on this particular subject. On the other hand,
it was testified by Mrs. Noble, appellant's intestate, that her
" father wrote out a paper and requested her to copy it and
send it to Col. B.," (attorney) ; and that in that paper she
" directed him (the attorney) to confess judgment. Did not
know the effect of that paper, nor what a judgment was."
The testimony of B. H. Micou, the father, is as follows :
" Mr. J. W. M., the attorney of Messrs. Moses Bros., came
and obtained her assent in form, and he, or Messrs. Moses
Bros., gave me a form of a letter or note that she was to
direct to her attorney, Col. B., to appear for her in court and
confess judgment She copied the form of said letter and
signed the same, and handed it to me." The foregoing is
all the record contains, tending to show Miss Micou had
personal, independent counsel. It falls very far short of the
rule required in such cases. It is much below the measure
of advice Richard King had in *Savery v. King*, 5 Ho. of
Lords, 627, and yet that court set the conveyance aside, on
the ground of presumed undue influence, which the court
thought was not sufficiently rebutted.

The judgment in this case was obtained through imputed

undue influence, not rebutted nor explained away by any testimony found in the record. That influence is of the nature of constructive fraud, which vitiates all transactions, even the solemn judgments of courts ; and is one of the acknowledged equitable grounds for setting aside judgments at law.—1 Brick. Dig. 666, § 376 ; *Yonge v. Hocper*, 73 Ala. 119.

Moses Bros., as to the items the bill seeks relief against, stand in no better right than would B. H. Micou, if he were suing. We think in this we stand on impregnable ground ; for as to these items, not only the complainant, but Boykin, her only advising friend, were in utter ignorance that they had been charged against her, until after the last transactions were had in her name, or upon her credit. So, she was without information on which to form an independent opinion.

It is further objected that there is a material and fatal variance between the allegations and proof in this case. The alleged variance is, that while Mrs. Noble charged in her bill that the plantations were cultivated by her as principal, through B. H. Micou as her agent, in reality he was the principal, and she only his surety. The writings between the parties evidencing their dealings, declare and fix the status of the parties precisely as it is set forth in the bill. Possibly the claim to relief would have been stronger, if the bill had truly set forth B. H. Micou's true relation to the transaction, for it would then have negatived all semblance of consideration moving to Miss Micou. It averred the contract as the parties expressed it in their writings, and it is sufficient. When a bill truly sets forth sufficient facts to entitle complainant to relief, the pleader may or may not at his option aver additional, cumulative facts, which only intensify, without varying the principle of relief claimed.

In what we have said above, we necessarily overrule the decision in this cause when it was formerly before us.—*Noble v. Moses*, 74 Ala. 604 ; Code of 1876, § 579.

We have declared above that Miss Micou, then Mrs. Noble, did not and does not by her bill claim or pray to be relieved of the entire liability she incurred by her agreement of March 3, 1875, and by her mortgage of February 7, 1876. The purpose was to eliminate from the account the balance of two thousand dollars, brought from the account of 1874, and charged to her at the beginning of 1875, with its interest. Also, the balance of Boykin's account for advances made for the Shorter place in 1875, charged to Miss Micou at the close of that year. Also all items of the account from the beginning, which are not provided for in the agreement

of March 3, 1875 ; and all interest and charges on moneys and other things advanced, loaned, or forborne, over and above eight per cent. *per annum*.   To this extent she is clearly entitled to relief, with this qualification.   There is some testimony that some part of the product of the crop grown on the Shorter place in 1875, went to Miss Micou's credit with Moses Bros., or, to her advantage in the continued cultivation of the plantations by her after that time. If such was the case, the credit of five thousand and twelve dollars, deficit of the Boykin crop, must be reduced to that extent.   And in stating the account, annual rests must be made, where payments have been made during the year ; but in no event so as to charge interest upon interest.

She is entitled to credit for all sums paid from her property, or property covered by the mortgages, or from her own private means.

In taking the account, the judgment will cut no figure whatever, either as conferring or taking away any rights. And, as what is known as the Lehman, Durr & Co. acceptances were part of the adjustment, which led to the judgment, that transaction will be entirely disregarded in taking the account, as conferring on Mrs. Noble no right to claim a credit therefor, and, as a consequence, dispensing with all inquiry as to the propriety of charging it back against Mrs. Noble.

We will not attempt a decretal order of reference.   The chancellor, aided by the suggestions of counsel, can perform this service much better than we have the means of doing.   We leave this subject entirely open for his consideration, with the exception that he will be governed by the principles declared above.

Reversed and remanded.

SOMERVILLE, J., dissenting.