RUTH E. PLANT *v.* SAMUEL H. PLANT.

1. ASSIGNMENT. *Undue influence. Father and son.*

A father's undue influence over his invalid son may be established by circumstantial, as well as by direct, evidence.

2. SAME.

Facts considered and held to give rise to a legal presumption of undue influence.

FROM the chancery court of Lafayette county.

HON. H. C. CONN, Chancellor.

The opinion states the case.

*H. A. Barr*, for appellant.

No wonder that the chancellor, although holding adversely to us, was constrained to admit that the transaction was suspicious. If it was suspicious, it ought to have been set aside. The natural and just influence which a parent has over a child renders it peculiarly important for courts of justice to watch over and protect the interest of the child, and, therefore, all contracts whereby benefits are secured by children to parents are objects of jealousy, and if they are not entered into with scrupulous good faith and are reasonable under all circumstances, they will be set aside. 1 Story Eq. Jur., sec. 309. Undue influence in business on the part of a father in a transaction with a son is presumed. Addison on Contracts, 158.

Where one of feeble understanding enters into a contract with a person in whom he has confidence, and there is unfairness or great advantage in the transaction to the person trusted, the inference is that there was undue influence. *Simonton* v. *Bacon*, 49 Miss. R., 582. If an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted, and the burden of the proof rests on the

person occupying the fiduciary relation to show that the transaction was fair and just. *Fisher* v. *Bishop*, 108 N. Y., 25. In a transaction between father and son, the law, upon a principle of public policy and to protect the son against overweening confidence and self-delusion and the infirmities of a hasty, precipitate judgment, pronounces the existence of undue influence on the part of the father, and, therefore, such transaction is *prima facie* void, unless the father show by the clearest proof that he dealt with his son exactly like a stranger, taking no advantage of his influence, and that the son acted upon his own volition and upon the fullest deliberation. This was declared in *Meek* v. *Perry*, 36 Miss., 190, in a case where a will was made by a ward in favor of a guardian, and the same principle applies as between father and son.

*Stone & Sivley*, on the same side.

Though a person is not incapable of making a valid contract, yet if there is such weakness of mind as to enable another in whom confidence is reposed to take advantage of him, and any unfairness is used, the contract will be rescinded. 1 Story's Eq. Juris., 235, 236; *Bunch* v. *Shannon*, 46 Miss., 526; *Simonton* v. *Bacon*, 49 Miss., 588. What is undue influence? 2 Pom. Eq. Juris., sec. 951; 38 Am. Rep., 385. Transactions between parent and child are always to be viewed with suspicion. Pom. Eq. Juris., sec. 956; Story's Eq. Juris., 309; 27 Am. & Eng. Enc. L., 485, 486, and 480; Bispham's Eq., sec. 235, and notes 2 and 3; 5 Lawson's Rights and Remedies, sec. 2369; Snell's Eq., 402; 2 Pom. Eq. Juris., 962; Thornton on Gifts, sec. 462; see also note 3, under sec. 962, Pom. Eq. Juris. Where both confidential relationship and weakness of mind are shown to exist the court should scrutinize the contract with the greatest care. *Graves* v. *White*, 4 Bax. (Tenn.), 38; 27 Am. & Eng. Enc. L., 457, 458, notes 1, 2, and 3; Thornton on Gifts, secs. 443 and 444. The presence or absence of an adviser at the making of the contract will effect the

amount of evidence required to set aside the contract. *Hench-man* v. *Emmons*, 1 N. J., Eq., 100. Will not the same presumption of undue influence arise in this case as if the same transaction was between husband and wife? 27 Am. & Eng. Enc. L., 485, 486, and 480; *Fisher* v. *Bishop*, 2 Am. St. Rep., 359, and notes. As to what constitutes fiduciary relationship, see Anderson's Dictionary, 459 and Story's Eq. Juris., sec. 218; 2 Pom. Eq. Juris., secs. 943, 944, 947, 951, 955, 956, and 962.

*W. V. Sullivan*, for the appellee.

Filed a brief discussing the facts of the case, and contending that they did not show undue influence.

Argued orally by *James Stone*, for appellant, and by *B. T. Kimbrough*, for appellee.

WOODS, C. J., delivered the opinion of the court.

The complainant, the widow of William Plant, a son of the appellee, S. H. Plant, seeks by her bill in this case to set aside the assignment of a policy of insurance for $2,000 on the life of said William Plant, deceased, made by him in October, 1895, to his father, the assignee, because procured by the exercise of undue influence on the part of the father over the son.

It is shown undisputedly that William Plant was never a very strong and healthy man, and that, under the ravages of that dreaded foe to the human race, consumption, for about a year before his death, he had become exceedingly weak, and was in that condition physically when the assignment of the insurance policy was made, and that he died about two months thereafter. As to his mental state, the evidence of his wife and mother-in-law is to the effect that he was incapacitated to attend to business. The evidence of several witnesses introduced by defendant is to the effect that these witnesses saw no signs of mental unsoundness or decay; but these witnesses state under what circumstances they occasionally saw him and

the casual observation of him made by them.    The evidence of his attending physician and that of his pastor is that, while not mentally unsound or insane, yet, nevertheless, in his extremely weak physical state his mind must have been affected also; for, as the physician very aptly expressed it, "if the mind did not become correspondingly weak with the body, then nature would not be in harmony with itself." We, then, have the case of one wasted and enfeebled by long disease, physically, and with a mind also weakened and enfeebled correspondingly.

The relationship between the parties was that of father and son.   The son, from his youth, had been under the direct control of the father—as a clerk in the father's store until he was admitted as a partner in his father's mercantile business, with "a working interest in the partnership," as the witness Hampton expresses it.   This witness, who was the bookkeeper of S. H. Plant & Son for several years, says: " I have known Will Plant for several years before his death, both when he was clerk in the store of his father and after he became a member of the firm.   He was always a most obedient son when it came to carrying out his father's instructions and directions.   I never knew of his objecting in any way, as he had implicit confidence in his father's business judgment, but I do not think he could have influenced Will Plant to do anything wrong." So, too, the witness Neill, who was employed by Plant & Son as a clerk, and who knew Will Plant well, says: " I know that he was always a very obedient son and always regarded his father's judgment in business matters very highly indeed, and observed it, but I don't think that his father could have influenced him to do anything but what was right."

Of like tenor is the other evidence on the point of his father's influence over him and his implicit deference in business matters to his father's opinion.   We have, then, a son never very strong and healthy, and, as Dr. Baird says, not "exceedingly strong mentally," whose father's influence in business matters was without bounds, except that the son could not be influenced

by his father to do anything wrong, conveying in his enfeebled physical and mental condition the entire proceeds of the policy of insurance, and by another instrument also conveying to the father everything he owned on earth, to the utter exclusion of a young and invalid wife, to whom he had been married about eighteen months before these transactions, with whom he had lived in perfect peace and happiness, and who was left penniless by this assignment.   His wife had brought him, at their marriage, a little money and some personal property, which had been consumed by him in his last illness, and no provision was made for her reimbursement.

When and where, and under what circumstances, was the assignment made?   The assignment was written by an eminent lawyer, not then in practice, and not by the regular attorney of the appellee.   It was written at night, in the absence of William Plant, the assignor, and at the request of the assignee. It bears date October 7, 1895, when William Plant was living with his wife in his own home, but when he signed it is not certainly shown.   The sworn bill avers that the assignment was signed on the twelfth of October, and after William Plant had removed from his own home to that of his father and while separated from the complainant, his wife, in pursuance of a suggestion made by the father.   It also appears from the transcript that the conveyance of William Plant's estate to his father, in which is made mention of the assignment of the said insurance policy, bears date October 7, the date named in the assignment, was not acknowledged by him before the proper officer until the fourteenth day of October, and after William Plant's removal to his father's home, and in the absence of the complainant, and after night, and that this conveyance was not filed for record until December 14, two months after its acknowledgment, and after William Plant's death; that the complainant was not made acquainted with the execution of the assignment at the time it was made, nor afterwards until the appellee had collected the money due on the policy from

the insurance company, is shown by her evidence, nor is she contradicted by any one.

By the evidence of complainant, which is uncontradicted, we are informed that William Plant, in anticipation of his early death, repeatedly informed his wife, the complainant, that this insurance policy was all he had to leave her, and expressed his regret that she would receive no more, and this both before and after the twelfth of October. It is shown further by complainant's evidence that, in a conversation had between the father and son at the residence of the son, in the presence of complainant, in the month of October, 1895, the son stated to the father that this policy was the only property which he had to leave his wife, and expressed the hope that the father would see that the insurance was properly paid to the wife at his death. To this the father replied, " God helping me, Willie, I will do my best to do as you ask me.'' It is also shown by complainant's evidence that, after the death of her husband, she inquired of appellee as to what had been done with reference to the collection of the money due under the insurance policy, and that he replied that she need give herself no uneasiness about the matter, as he and Mr. Porter had prepared all the necessary proofs of death, and were giving the matter their attention, and that he would let her know as soon as the insurance company paid the policy, and not until the appellee had collected the money did she ever hear of his setting up any claim to the proceeds of the policy.

It is insisted that there is no direct evidence of the exercise of any undue influence of the father in procuring the assignment from the son. But, in view of the evidence, which we have gone into largely, *res ipsa loquitur*, and under the circumstances, the law will infer the undue influence. *Bunch* v. *Shannon*, 46 Miss., 525; *Simonton* v. *Bacon*, 49 Miss., 582; *Nobles, admr.*, v. *Moses*, 81 Ala., 530; *Haydock* v. *Haydock*, 7 Stew. N. J. Eq., 570.

The presumption arising from all the evidence that there was

undue influence must be met by the appellee, and because he has not, the decree must be

*Reversed and the cause remanded.*